**Emanuel Newman, Plaintiff-Appellant, v. Mitchell Spellberg, Defendant-Appellee.**

**Gen. No. 51,458.**

First Judicial District.

January 24, 1968.

George Rabens, of Chicago (S. Joseph Formusa, of counsel), for appellant.

Hubbard, Hubbard, O'Brien & Hall, of Chicago (Alvin G. Hubbard, Reese Hubbard, and Frederick W. Temple, of counsel), for appellee.

EBERSPACHER, J.

This is a medical malpractice action brought to recover damages occasioned by the alleged negligence of the defendant physician arising out of a gastroscopic examination performed upon the plaintiff. At the close of the plaintiff's case, the court sustained the defendant's motion for a directed verdict. Judgment for the defendant was entered on the verdict from which the plaintiff brings this appeal.

The plaintiff, Emanuel Newman, is 48 years old. The defendant, Mitchell A. Spellberg, is a physician, has engaged in practice for 30 years and maintains his office in Chicago, Illinois. He was certified as a specialist in internal medicine and gastrology in 1942 and has been practicing his specialty since that time.

In early 1959, the plaintiff experienced discomfort in the stomach and consulted the defendant. Through the defendant's examination it was determined the plaintiff had a peptic ulcer. Treatment was prescribed and in April 1959 the defendant advised the plaintiff that an X ray indicated that the ulcer was completely healed. The defendant further advised the plaintiff that in order to assure his opinion a gastroscopic examination was desirable. Accordingly, at defendant's instruction, the plaintiff and defendant met at the out-patient surgery unit of Michael Reese Hospital, Chicago, Illinois, on May 7, 1959, at 8:00 a. m. The plaintiff was accompanied by his wife.

The plaintiff entered one of the rooms of the surgery unit and after removing a portion of his clothing was given two injections over a 15-minute period by a nurse. He was then given a fluid with which to gargle. Still later the plaintiff's throat was swabbed with an anesthetic

312

to "freeze" the throat. The defendant who had entered in the meantime inserted a rubber tube into the plaintiff's stomach and drained its content. The tube was withdrawn and the plaintiff was instructed to lie upon his back with his head hanging over the edge of the table. The room was dark and a cloth towel was placed over the eyes of the plaintiff. The nurse leaned over the upper portion of the plaintiff's body and held both of his arms, remaining in that position during the entire course of the gastroscopic examination, which the defendant then commenced.[1]

Plaintiff further testified that he felt the instrument being passed into his throat and down into his esophagus and stomach; that it was uncomfortable but that he did not retch nor fight it in any way, and that as the instrument was being inserted defendant described what he was doing and told him his stomach was being inflated, and that he would be able to look around within the stomach with the aid of the light. He testified that the defendant

[1] The gastroscope, which was the same one used during the examination, was produced in court and described by the defendant. At the distal (far) end, which is inserted first, is a flexible rubber tip about an inch to an inch and one-half in length, followed by a metal portion approximately one inch long which contains the light bulb mirror and lens. Behind that is a firm rubber tube approximately one to one and one-quarter feet long which is connected to a metal tube of approximately the same length. At the opposite end of the metal tube are handles, dials and the eyepiece which enable the physician to scan the interior of the patient's stomach. The rubber tip is to protect the patient from injury by the metal light source, and it can be bent right at the place where they connect if the instrument is pushed hard.

The defendant, in his description of the procedure stated that it is necessary to inflate the stomach by use of a rubber bulb which forces air through the gastroscope and into the organ so that the interior surfaces of the stomach are moved away from the instrument and the physician is enabled to see the stomach lining.

313

then made his visual examination and informed plaintiff that everything was clear and there was nothing to worry about and that he had no ulcer. Plaintiff testified that he then heard someone walk into the room and defendant started to talk to this individual and began explaining to him the process of the examination and the practice in the use of the instrument. Plaintiff further testified that while defendant was talking to this individual "he took me under one arm and moved me upward toward him with his body and when he moved me, I felt a sharp pain in my back," and that he had felt no pain in his back until defendant moved him at that time. Plaintiff testified that after defendant's description of the use of the gastroscope to the third party, for about two or three minutes, the instrument was then removed very slowly; following the removal of the instrument, the lights were turned on, the towel removed, and plaintiff was propped up in a sitting position, and told the defendant that he had a pain in his back to which the defendant replied, "Don't worry about the pain in your back. It was because of the position you were in that you probably got a kink in your back." Plaintiff testified that defendant then introduced him to the third person in the room, who appeared to be an intern, wrote out a prescription for him, and left the room; that he complained constantly about the pain in his back and that it was a sharp pain when he first felt it and that it was continuous. On cross-examination, plaintiff testified that the movement that defendant induced was a movement of his body of one or two inches forward, when the defendant pulled plaintiff under the arm toward him, and that plaintiff was positive that such movement "caused the puncture."

The plaintiff then dressed and, due to his weakness and pain, sat with his wife in the waiting room for some 15 minutes before leaving the hospital. This was at approximately 10 o'clock. During the drive home, the

plaintiff's pain continued in its intensity. Sometime after one o'clock the plaintiff's wife contacted the defendant by telephone who prescribed codeine. She called back within ten minutes and the defendant advised her to return the plaintiff to the hospital. The defendant testified that at this time it occurred to him that there may have been a perforation of an internal organ.

Mrs. Newman returned the plaintiff to the hospital where they were met by the defendant. The plaintiff testified that he passed out after arriving at the hospital and remained unconscious for the next 48 hours. The defendant gave an injection to the plaintiff for the pain which he described as severe. The plaintiff was then taken to the X-ray department to determine whether there was indication of a rupture of an internal organ. The defendant then ordered the plaintiff put to bed and prescribed certain medication. The defendant testified that the examination, including the X rays, was inconclusive but that he formed a diagnostic impression of a possible viscus perforation. The defendant also determined that a surgeon should be notified. He informed the plaintiff's wife of this decision. Shortly before 4 p. m. the plaintiff's wife informed the defendant of her decision to employ Dr. Morris Parker for surgery. The defendant telephoned Dr. Parker and gave him the tentative diagnosis. Dr. Parker arrived at the hospital at 6:15 p. m. and commenced the surgical operation at 8:00 p. m. Another physician, Dr. Milton Mosko, an allergist and friend of the plaintiff, participated in the examination by Dr. Parker and was also present during surgery.

Dr. Parker testified that an incision was made in the abdominal cavity and that he located a longitudinal split of about two centimeters in length in the back wall of the esophagus at the point where it joins the stomach. Dr. Mosko testified that he saw a small tear in the esophagus which was pointed out to him by Dr. Parker. He further

315

testified that, in his opinion, the perforation of the esophagus was caused by the procedure of the gastroscopic examination, and that the "tear" was produced by a portion of the gastroscope piercing the esophagus. After locating the wound Dr. Parker closed it with sutures. Following the operation the plaintiff experienced a long and difficult recovery.

The defendant, called under section 60 of the Civil Practice Act [2] after describing the procedure used in preparation of a patient for a gastroscopic examination, described the procedure used in inserting the instrument through the throat, esophagus and into the stomach. He testified that in addition to himself and a nurse, there was also present an orderly supplied by the hospital, who held the patient's head, who was unknown to him; that during the examination he did not describe the method of procedure to anyone, and that he "possibly told the orderly to rotate the head" into the best position for seeing the lining of the stomach, and that defendant at no time during the course of the examination moved plaintiff's body. Defendant explained that during the course of such examination two movements are used, rotation of the head, and bending the knees to relax the muscles of the stomach and the back. The witness did not have an independent recollection of any movement, but testified that such movement must have been made "because the examination was satisfactory, and the patient was in proper position"; and that if there was a good optimum, he would not have given any direction for movement, and that he could not recall whether it was necessary to give such direction in this examination.

The defendant further testified that the instrument passed through the esophagus with a minimum of difficulty and was temporarily held up at the junction of the

---

[2] Ill Rev Stats 1965, c 110, § 60.

esophagus and stomach until the patient relaxed and the instrument passed into the stomach. He next inflated the stomach and the patient indicated no distress. He further testified that he then completed his visual examination, through the gastroscope, during which the patient showed no distress, and found no unusual pathology and that everything was in order, and confirmed his previous diagnosis that plaintiff's ulcer was healed. His testimony was also that when plaintiff's wife advised him by telephone of plaintiff's extreme pain he told her "that it was strange and unusual, because the procedure—the examination itself was satisfactory."

The defendant also testified that in performing this examination and insertion of the instrument, he followed the same procedure that he had followed on several thousand patients, and had, over a period of 30 years, performed approximately 5,000 gastroscopic examinations; and that in this experience he had experienced only one instance of a perforation. The defendant doctor did not recall that the patient complained to him of any pain in the back.

The complaint filed by the plaintiff, as amended, alleges in part that:

> ". . . The defendant, without due regard for the health and safety of the plaintiff, carelessly, negligently, unskillfully and improperly prepared for, prepared the plaintiff for, and performed the said gastroscopic examination, and carelessly, negligently, unskillfully and improperly failed to provide requisite medical services and attention to the plaintiff following upon the said examination; and, particularly, but not in limitation of the foregoing, the defendant pierced and lacerated an internal organ of the plaintiff, to wit: at the gastro-esophageal junction, with an instrument described as a gastroscope, in the course of the examination aforesaid, and thereafter

317

failed to afford to the plaintiff the medical attention and services which were thereby reasonably, necessarily, and properly required. . . ."

■ Since this cause was ruled upon below and the briefs filed herein, the Supreme Court, in a personal injury action based upon negligence, has, after reviewing the various standards used in determining the propriety of directed verdicts, spelled out the rule that "verdicts ought to be directed . . . only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria & E. R. Co., 37 Ill2d 494, 229 NE2d 504, 513–514. We are, therefore, called upon to determine whether plaintiff's evidence, viewed in the aspect most favorable to him, so overwhelmingly favors the defendant doctor, that a plaintiff's verdict could not possibly stand. As we understand plaintiff's theory, it is that the defendant was negligent in lifting the patient while the nurse was holding him down, for the purpose of exhibiting to a third person the procedure which had been used in inserting the instrument and in making the visual examination after that procedure had been completed without injury to the patient—an act which was ulterior or extraneous to either the insertion of the instrument, or the visual examination or the subsequent removal of the instrument. The evidence offered by defendant, an acknowledged expert in his field, showed this was an act which in no way facilitated and was unnecessary for either the insertion of the instrument, its use in conducting the visual examination or the subsequent successful withdrawal of the instrument.

Plaintiff contends that there was sufficient evidence to establish plaintiff's prima facie case under the law of Illinois and that the trial court failed to take into account

the reasonable inferences from all of the testimony favorable to the plaintiff.

Defendant contends that plaintiff has failed to prove both the negligence of the defendant and the causal relationship, if any, between defendant's unskillful or negligent conduct and plaintiff's injury.

The theory of the court in directing the verdict was that a prima facie case could not be established without expert medical evidence to show want of care and that the rupture of the esophagus was caused by the lack of care.

 Two recent cases, Graham v. St. Luke's Hospital, 46 Ill App2d 147, 196 NE2d 355, and Scardina v. Colletti, 63 Ill App2d 481, 211 NE2d 762, have discussed the necessity of expert testimony to prove both the negligence of the doctor, and the causal relationship, if any, between the defendant's negligent conduct and plaintiff's injury in malpractice cases. The latter case makes quite clear that there are exceptions; in that case spelled out, as the "common knowledge" and "gross negligence" exceptions. In Scardina v. Colletti, 63 Ill App2d 481, 211 NE2d 762, at page 488, the court said:

> "In a malpractice action a physician will be held responsible for injuries resulting from his want of reasonable care, skill and diligence in his practice. The plaintiff must prove by affirmative evidence the defendant was unskillful or negligent and that his want of skill or care caused injury to the plaintiff. It is not enough to prove that he made a mistake or that his treatment harmed the plaintiff; proof of a bad result or mishap is no evidence of lack of skill or negligence.

> "Generally it is necessary for the plaintiff to show by expert testimony not only that the injury occurred, but that such an injury does not ordinarily occur in the normal course of events without negli-

319

gence. (Citing cases.) The so-called 'common knowledge' and 'gross negligence' exceptions to the requirement of expert testimony are applicable if the negligence of the physician is so grossly apparent or the treatment is such a common occurrence that a layman would have no difficulty in appraising it."

It is to be pointed out that in both Scardina and Graham the court was dealing with applications of the accepted rules where the plaintiff sought to recover for an unfortunate result which occurred as a result of an act that was an implicit part of the accepted procedure; in Graham, a nerve injury from the insertion of a hypodermic needle; in Scardina, a hemorrhage resulting from a hernia operation. Here plaintiff has presented evidence of a deviation from the proper standard of care, as defined and spelled out by the defendant doctor's testimony when called under section 60. Plaintiff has furnished evidence of an extraneous act, as foreign to the standard procedure, as defined by the expert doctor, as if it were evidence that the doctor had blinded the patient by sticking his finger in his eye during the course of a gastroscopic examination. This is not the case of a bad result or mishap occurring while the doctor was inserting the instrument, or even making the visual examination; neither did it occur as a result of any of the accepted movements as defined by the doctor, that of flexing the knees to relax the patient for ease of insertion of the instrument, or rotation of the head to facilitate the visual examination. Both the insertion and visual examination had, according to the testimony of both plaintiff and the defendant doctor, been satisfactorily completed with a satisfactory result.

From the uncontradicted evidence that the nurse draped herself over plaintiff's body and held both his arms, it could be reasonably inferred that defendant intended no movement other than the rotation of the head and the possible flexing of the knees. Obviously, from reviewing

the doctor's testimony, he had no independent recollection of what movement was necessary to successfully perform the examination in this case, since he did not recall whether the knees were flexed or the head rotated. There is no evidence that either of these permitted movements were made. The doctor, who had performed 5,000 gastroscopic examinations, did not include lifting the patient's torso with the instrument inserted while a nurse held the patient down and thus putting an excess pressure on the patient as a part of the standard procedure in gastroscopic examination. Although the doctor's evidence does not confirm that this movement, foreign to the procedure as outlined by the expert was made, there is in the record positive evidence that the doctor, after pronouncing the insertion and examination thus far satisfactory, deviated from the proper standard of care by lifting the torso of the patient to exhibit him to a third party. Evidence of such deviation from a proper standard of care certainly cannot be ignored in a proceeding in which the plaintiff's evidence is to be viewed in the aspect most favorable to him.

Defendant contends that since perforation of the esophagus may result from excessive retching or gagging by the patient, or an unusual force needing to be applied to insert the instrument, or a natural weakness of the walls of the esophagus, that plaintiff must show by expert evidence that the alleged unorthodox movement by the defendant caused the injury. He further contends that the entire procedure of gastroscopy and rupture of the esophagus are of such great complication that neither are matters of common knowledge that can be readily appraised by a layman without the help of medical testimony.

██ There is no evidence here that once the instrument was inserted there was any retching or gagging, nor is there any evidence that any unusual force was

necessary to insert the instrument, or that there was any weakness of the walls of the esophagus. In fact the evidence of both plaintiff and defendant was that the insertion of the instrument was successfully made without injury to plaintiff, and that the visual examination by the use of the inserted gastroscope was successfully completed without incident. Furthermore, it is not necessary that a plaintiff, in order to make a prima facie case, negate every theory or speculation which might be propounded by the medical profession as to what might have been the cause that would excuse the physician of his alleged negligence; particularly when plaintiff has proceeded on the theory that the negligence was the departure from the accepted standard of procedure.

To us it is plain common sense and common knowledge, that when a patient is being held to assure that his torso is not moved while a foreign object such as a gastroscope is inserted into his innermost organs, injury would probably be sustained when an excessive or unnatural pressure was put upon his torso by lifting it against the force attempting to hold it in place. Here the uncontradicted testimony is that the sharp pain was first felt at the time plaintiff's torso was so lifted. It is a reasonable inference that it was at that time that the injury occurred.

Defendant contends that the entire subject matter of gastroscopy and injuries to the esophagus are beyond the scope of common knowledge so as to require expert testimony on the issue of negligence and causation. We find no reported Illinois cases dealing with injuries sustained during gastroscopic examination; and we do not consider the two Pennsylvania cases upon which defendant relies to support such premise, as being of sufficient breadth or scope to apply to the factual evidence here before us.

In Robinson v. Wirts, 387 Pa 291, 127 A2d 706, and Demchuk v. Bralow, 404 Pa 100, 170 A2d 868, 88 ALR2d 285, the Pennsylvania Supreme Court by divided opinion

affirmed directed verdicts in favor of defendant physicians who had performed gastroscopic examination on the plaintiffs whose esophagi were punctured. In each it was taken as true that the gastroscope had actually pierced the wall of the esophagus. Here we have affirmative evidence that there was a "perforation" of the esophagus by two experts. In each of those cases the injury occurred while the instrument was being inserted in accordance with the established standard procedure. In both cases difficulty in inserting the instrument through the junction of the esophagus and stomach was encountered and after numerous attempts to insert the gastroscope into the stomach, the physicians in both cases, noted the discomfort of the patient, immediately suspected perforation and withdrew the instruments without making the visual examination. In neither of those cases was there any evidence of departure from the accepted standard procedure in attempting to insert the instrument. Here the insertion of the instrument was accomplished without injury, the visual examination successfully made, and all of the proceedings through that point carried out without any indication by either the patient or physician that any injury had been sustained. In fact, the procedure to that point was pronounced satisfactory to the patient by the physician at that time, and the physician admits that even hours later he declared the examination was satisfactory.

Plaintiff is not here contending, as plaintiffs did in those cases, that the physician was not skillful or did not use proper care in attempting to insert the instrument. He charges negligence in deviating from the standard procedure by lifting the torso of the patient while the patient was being held down with the instrument inserted for exhibition to a third party. This is not the case of the physician who "applied gentle pressure and insufflation aimed to distend the walls of the stomach and esophagus

so as to clear the passage for the tube" in accordance with "the normal and recognized method in such cases of overcoming the obstacle created by the spasm." [3] Here the pressure which the evidence shows was violent and excessive under the circumstances, was not exerted in the course of either insertion or visual examination, nor for any purpose directly connected with the gastroscopic examination. Here there was no evidence of any spasm or muscular contraction which justified the use of any force by the physician, to accomplish the purpose to which plaintiff had consented (the exploratory examination). That purpose was accomplished without any force that resulted in injury to plaintiff.

While the majority in the Pennsylvania cases determined that the procedure of insertion of the gastroscope was not within the common knowledge and ordinary understanding of a layman, they were careful to point out that those cases did not involve "extraneous acts the judgment of which would *not* require scientific opinion." (Emphasis ours.) See Demchuk v. Bralow, 404 Pa 100, 170 A2d 868, at p 871. In the Demchuk case the majority quoted from the Robinson case, emphasizing by the Court's italics, the particular point of distinction to be here observed. The language of the Pennsylvania Court found at 170 A2d 870–871, is:

> "It would be a matter of common knowledge *and observation* that such things do not ordinarily attend the service of one exercising ordinary skill and experience in the work of surgery *because they involve ulterior or extraneous acts or omissions the judgment of which would not require scientific opinion.*"

[3] Quoted language from Robinson v. Wirts, 387 Pa 291, 127 A2d 708.

Klein v. Arnold, 203 NYS2d 797, involved a procedure quite similar to the gastroscopy. In that case an esophagascope, which is apparently used to view the esophagus rather than the stomach, was inserted into plaintiff's body, and the esophagus was perforated by the instrument. There was no expert evidence introduced by the plaintiff on the question of negligence, but the case was submitted to the jury which returned a verdict in favor of the defendant. On appeal the defendant raised the issue that the suit required dismissal because of the absence of expert testimony. The judgment was affirmed on other grounds, but the court concluded that expert evidence of negligence was not required. It was determined, that the result was of such character as to warrant the inference of want of care in the light of the knowledge and experience of the jurors themselves. Based solely upon the facts that the instrument was inserted, and plaintiff suffered injury from it, the New York court held that a prima facie case was established.

In the present case there is even a stronger showing of negligence for not only is the rare, unusual character of the result here to raise the inference of negligence, here is evidence that the act of the defendant which caused the injury was an unnecessary deviation from the ordinary examination procedure. Only the physician controlled the movement of the instrument and the patient; this was more than a mere happening of an accident or a bad result in the course of accepted procedure. The physician took a chance that he could exert pressure on the torso of the plaintiff to demonstrate, and that injury would not result; but it did, in what was not a critical or curative operation, but only an exploratory one, successfully concluded.

Here we have an injury which would not ordinarily have occurred but for an act of negligence (defendant had

performed 5,000 gastroscopic examinations, with only one case in which there was a perforation, and his own experience in that regard was comparable to the general experience in the field of his specialization); there is evidence that the injury was caused by the agency or instrumentality within the exclusive control of the defendant, and there is no evidence that the injury was sustained due to any voluntary act on the part of the patient nor was it contributed to by him. When such conditions have been shown to exist, plaintiff has established a prima facie case and the burden of coming forth with evidence that the occurrence was due to a definite cause unrelated to any negligence on his part, or that the care given was such that the occurrence could not have been due to want of care, but must have been brought about by an unpreventable cause. We do not consider that there may be any departure from these principles in this case, in view of plaintiff's evidence to the effect that the injury occurred as a result of the departure by the defendant from the accepted standard of procedure (lifting the patient against the weight of the nurse while the instrument was inserted to display the patient with the inserted instrument to the nonparticipant).

The trial court has failed to recognize the evidence of the extraneous or ulterior act as well as the reasonable inferences which logically arise from the established facts, and erred in sustaining the defendant's motion for directed verdict. The evidence, viewed in its aspect most favorable to plaintiff, certainly does not so overwhelmingly favor defendant, that a plaintiff's verdict could not possibly stand. We therefore reverse the judgment of the Circuit Court and remand the cause.

Judgment reversed, cause remanded.

GOLDENHERSH and MORAN, JJ., concur.