MIRIAM ANDERSON, Plaintiff-Appellant, *v.* KENNETH MARTZKE *et al.,* Defendants—(ROBERT MUENCH, Defendant-Appellee.)

(No. 53490; )

First District—November 5, 1970.

Rabens, Formusa & Glassman, of Chicago, (S. Joseph Formusa, of counsel,) for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago, (Bernard Harrold, of counsel,) for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff Miriam Anderson brought this suit for personal injuries against Kenneth and Donna Martzke, owners of the premises upon which plaintiff was injured, and against Robert Muench, her treating physician. At the close of plaintiff's case, the trial court directed a verdict in favor of the defendant doctor. After the directed verdict, the trial continued against the Martzkes. The jury returned a verdict in favor of plaintiff and against the Martzkes in the amount of $5,000; judgment was entered thereon, and was satisfied and released by plaintiff. On appeal, plaintiff does not challenge the validity of the judgment against the Martzkes, but contends that the trial court erred in directing a verdict in favor of defendant. Defendant responds that the trial court correctly directed a verdict in his favor, and also argues that the satisfaction and release of plaintiff's judgment against the Martzkes operated as a release of defendant as well. The evidence brought out at trial is as follows:

In July, 1961, the Martzkes asked plaintiff, a friend and neighbor, to return a diaper pail to the diaper service while they were out of town. When the diaper service came to pick up the pail on the following morning, plaintiff could not find it in the Martzke home, so she looked in their garage. As she entered the garage, she stepped in a board with a nail in it, and the nail punctured the sole of her foot to a depth of about one inch. Plaintiff testified at trial that she thought it was her right foot which had been injured.

Plaintiff also testified that a few hours later, her foot became painful, and she went to see defendant, her family physician. He treated the foot with medication and a dressing. He also gave her a tetanus shot. Before giving her the tetanus, defendant had his nurse administer a test shot, an injection in the skin. About fifteen minutes after the test was given, plaintiff testified that there was a redness and a raised area at that part of the arm where the test was given. She also testified that the raised and red area was about the size of a dime, and resembled a mosquito bite. Defendant then looked at plaintiff's arm, and had his nurse administer the tetanus shot.

That evening plaintiff contracted a fever. Defendant treated the fever, prescribed medicine and several days later, the fever subsided. After the fever subsided, plaintiff noticed a pain in the area of the arm where she had received the shot. Her upper arm became swollen,

eventually became blistered and then turned black. She was treated by defendant for this condition, and saw him many times. In September 1961, she was hospitalized and surgery was performed on her arm by Doctor Milford.

Doctor James Milford, a general surgeon, testified that he examined plaintiff on September 25, 1961. She had a black area on her upper arm, which he diagnosed as necrosis of the skin. This condition was caused by an allergic reaction to an injection she had received. Doctor Milford removed the dead tissue by means of surgery, and treated her with tetanus toxoid.

Defendant testified as an adverse witness under Section 60 of the Civil Practice Act that he treated plaintiff for the injury to her foot. In addition to cleansing the wound and applying a dressing, he concluded that the best treatment would consist of giving her an injection of tetanus antitoxin. The administration of the antitoxin involved known medical dangers, such as a local reaction and necrosis of the skin. Proper medical procedure required that a test be given to the patient before administering the antitoxin. Defendant further testified that he performed a common test, the injection of a microscopic amount of serum beneath the superficial layer of the skin. If a wheal formed on the skin, it would indicate a positive reaction. A positive reaction would show that the patient was sensitive to the serum and should either be given a lesser dosage of antitoxin or none at all. At trial, defendant testified that a wheal could not be likened to a mosquito bite, but rather to a bite which had been scratched. He admitted that at his deposition he had defined a wheal as a raised, whitish area, rising above the surface of the skin like a large mosquito bite. Defendant also testified that he administered the test to plaintiff, and some minutes later he observed a minute elevation caused by the needle and an area of redness about the size of a dime. He considered the reaction to be negative, and had the remainder of the antitoxin administered to plaintiff. Defendant also testified that he did not believe that plaintiff's description of the area at trial constituted a positive reaction.

Plaintiff contends that the trial court erred in directing a verdict in favor of defendant. Defendant's motion for directed verdict was allowed on the grounds that plaintiff had not produced sufficient evidence to establish a *prima facie* case of negligence against him, in that plaintiff's evidence did not establish that defendant failed to follow an acceptable standard of medical care in his treatment of plaintiff.

■■ Verdicts should be directed and judgments notwithstanding the verdict entered only in those cases in which all the evidence when viewed in its aspect most favorable to the opponent, so overwhelmingly

favors movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria and Eastern R. R. Co.* (1967), 37 Ill.2d 494, 229 N.E.2d 504.) In order to recover in a medical malpractice action, plaintiff must show that defendant was unskillful or negligent, and that his want of skill or care caused injury to the plaintiff. (*Graham v. St. Luke's Hospital* (1964), 46 Ill.App.2d 147, 196 N.E.2d 355.) Plaintiff must show that defendant failed to afford treatment in accordance with the medical standard of care applicable to the medical procedure under consideration. And defendant's failure to provide treatment according to acceptable standards must be established by expert medical evidence. (*Berkson v. Chandler* (1955), 5 Ill.App.2d 583, 126 N.E.2d 389.) However, the testimony of a defendant doctor may be sufficient to satisfy the requirement that there be expert testimony as to the issue of acceptable medical standards of care in a community. *Gorman v. St. Francis Hospital* (1965), 60 Ill.App.2d 441, 208 N.E.2d 653.

By virtue of defendant's expert testimony, plaintiff was able to establish the acceptable standard of medical care necessary in the instant case. Before administering the antitoxin, proper medical procedure required that a preliminary test be performed, and that consisted of the injection of a small amount of serum into plaintiff's skin. If there were a negative reaction to the preliminary test, it would be proper to administer the antitoxin to plaintiff. If there were a positive reaction, proper procedure would indicate that the antitoxin not be administered, or in the alternative that a reduced dosage be given.

■■ Thus the determinative issue becomes whether plaintiff's testimony was sufficient to show that she had a positive reaction to the preliminary test, so as to have created a factual issue for the jury. We believe that her testimony was sufficient to creat such an issue. Defendant established that it would be improper to administer the antitoxin to anyone who demonstrated a positive reaction to the preliminary test. He also established that such a reaction would be indicated by the formation of a wheal on the skin, and described a wheal as an elevated portion on the skin, which could be likened to a large mosquito bite which had been scratched. Plaintiff testified that after the test was given, there was a raised and red area on her arm about the size of a dime which resembled a mosquito bite. That description of the arm was a matter of simple observation on the part of plaintiff, and did not require that she have any expertise or special medical training. We believe that plaintiff's testimony was sufficient to create an issue of fact for the jury as to whether there had been a positive reaction to the test, and thus whether defendant had been negligent in administering the full dosage of the antitoxin.

In *Gorman v. St. Luke's Hospital, supra,* plaintiff sued for injuries arising out of an over-exposure to X-rays. Defendant doctor testified that a ten minute exposure of 2,050 Roentgens would not be good medical practice, and also testified that he had given plaintiff a five minute exposure. However, plaintiff testified that he had been exposed to the X-ray for ten minutes. In affirming judgment for plaintiff, this court stated that plaintiff's own testimony, although contradicted by defendant, was sufficient to establish a departure from acceptable medical standards.

In *Newman v. Spellberg* (1968), 91 Ill.App.2d 310, 234 N.E.2d 152, defendant doctor, while conducting an examination of plaintiff, inserted a gastroscope through plaintiff's esophagus and into the stomach. Plaintiff testified that during the examination, his body was abruptly moved by defendant and that he felt pain. Defendant testified that a patient's torso should be kept immobile during such an examination, and also denied that he moved plaintiff's body. This court reversed a judgment which had been directed in behalf of defendant, and held that plaintiff's testimony to the effect that the injury occurred as a result of the departure by defendant from the accepted standard of procedure was sufficient to create a *prima facie* case.

*Huber v. Protestant Deaconess Hospital Ass'n.* (1956), 127 Ind. App. 565, 133 N.E.2d 864, involved a suit against a doctor for the improper administration of a spinal anesthetic during an operation. Defendant testified that the proper place for such an anesthetic was between the second and third lumbar vertbrae, and also testified that the anesthetic given to plaintiff was made at that point. Plaintiff testified that the anesthetic was administered much higher up on his back. The Indiana court held that there was sufficient evidence to create an issue of fact for the jury as to whether defendant was negligent.

In the present case, after the proper standard of care had been established, plaintiff's description of her arm was not beyond the scope of common knowledge so as to require expert testimony. We find that plaintiff's evidence was sufficient to establish a *prima facie* case as to whether she had a positive reaction to the test, and that the trial court erred in directing a verdict in favor of defendant.

Defendant also argues that even if the trial court erred in directing a verdict in his favor, the satisfaction and release of plaintiff's judgment against the Martzkes operated as a release of defendant as well.

■■ There can be but one satisfaction for a single, indivisible injury, and if the injured party makes a settlement with one tort feasor and releases him that also operates as a release of the other tort feasors, whose tortious acts concurred in the same single, indivisible injury, whether all of the tort feasors engaged or did not engage in concerted

action, when their acts produced the same single, indivisible injury, be they strictly joint tort feasors or independent concurring tort feasors. There cannot be a double recovery for a single injury, and one release is a bar to further claims for the same tort. *Tidwell v. Smith* (1960), 27 Ill.App.2d 63, 169 N.E.2d 157; *Manthei v. Heimerdinger* (1947), 332 Ill.App. 335, 75 N.E.2d 132.

However, in *Tidwell v. Smith, supra,* the court went on to say at p. 72: "But a release to, or the receipt of money from, a tort feasor who is not in fact liable with another will not discharge such other, where the respective tort feasors have committed separate and distinct offenses against or inflicted separate and distinct injuries upon the plaintiff (citations omitted)."

■■ Where separate tortious conduct results in a separate and distinct injury, the release of one tort feasor does not operate as a release of another, nor does it act as a bar to further action against the second tort feasor. In the instant case, plaintiff sustained two separate and distinct injuries, an injury to her foot and another to her arm. Defendant was not charged with aggravating the injury to plaintiff's foot, but rather with causing a new and distinct injury affecting a different part of plaintiff's body. Moreover, the defendant's act was separate and distinct from the tortious act of the Martzkes. Consequently, we find that plaintiff's release and satisfaction of the judgment against the Martzkes did not act as a bar to her cause of action against defendant.

Cases cited by defendant for the proposition that the release of one tort feasor is a release of all, are either distinguishable from the present case or inapplicable. In *Laver v. Kingston* (1956), 11 Ill.App.2d 323, 137 N.E.2d 113, plaintiff attempted to recover damages from an employer of a truck driver for the same injuries and under the same facts for which he had already obtained judgment against the truck driver. This court properly barred the subsequent action. In *DeLude v. Rimek* (1953), 351 Ill.App. 466, 115 N.E.2d 561, and *McClure v. Lence* (1953), 349 Ill.App. 341, 110 N.E.2d 695, dram shop owners argued that releases between plaintiff and the parties involved in the collisions which caused plaintiffs' injuries, discharged them from liability in subsequent actons under the Dram Shop Act. This court held that the releases, although covering the same injuries, did not bar plaintiffs' actions against the dram shop defendants.

Accordingly, the judgment of the Circuit Court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and cause remanded.

DEMPSEY, P. J., and SCHWARTZ, J., concur.