RUTH SCHINDEL, Plaintiff-Appellee, v. ALBANY MEDICAL CORPORA-
TION, d/b/a Albany Women's Medical Center, Defendant-Appellant.

First District (5th Division)   No. 1—91—2485

Opinion filed August 13, 1993.

Richard M. Kates, of Chicago, for appellant.

Steven J. Rosenberg, P.C., of Chicago, for appellee.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiff brought this action to recover damages which occurred when plaintiff's fallopian tube ruptured because of an ectopic pregnancy. Plaintiff alleges that defendant, Albany Medical Corporation, following a pregnancy termination procedure in defendant's clinic, (1) failed to employ and enforce proper procedures to notify plaintiff of abnormal laboratory findings, (2) failed to notify her of abnormal laboratory findings, and (3) failed to notify her of the possibility that she had an ectopic pregnancy. Defendant appeals from a jury verdict and judgment entered in favor of plaintiff in the amount of $25,000. Defendant contends that the trial court improperly denied its motions for a directed verdict at the close of plaintiff's case in chief and at the close of all evidence and its post-trial motion for directed verdict, judgment notwithstanding the verdict, or new trial, due to plaintiff's failure to present expert testimony regarding the applicable standard of care. For the reasons set forth herein, we reverse.

The following evidence was introduced during a three-day trial. Defendant operated a limited-service medical clinic which provided gynecological outpatient services, including birth control, routine exams, pap smears, sterilizations, surgery for infections, and terminations of pregnancies. On Saturday, November 13, 1982, plaintiff visited the clinic to have an abortion. She was accompanied by her boyfriend, Henry Ortiz.

Upon arrival at the clinic, plaintiff was asked to provide some personal information, including a phone number. According to plaintiff, she was not asked for an emergency or work phone number. She gave the clinic her home phone number. Plaintiff also spoke with a counselor prior to having the medical procedure, and signed a consent form which included the following provision:

"I recognize that a first trimester abortion cannot terminate an ectopic pregnancy (outside the uterus) and no guarantee has been made to me regarding the outcome of this procedure."

Plaintiff received written aftercare instructions which included the following symptoms as "complications" which "are not normal": heavy bleeding (light bleeding was indicated as normal), temperature above 100.4 degrees, severe cramping, discharge with bad odor, bloating, and severe abdominal pain. The aftercare instructions stated that if any of those symptoms occurred, the patient

should call the clinic's 24-hour telephone number. That number appeared three times on the written aftercare instructions.

Plaintiff testified that she read the aftercare instructions and kept them. She said she was also given oral instructions as to possible post-operative symptoms and what to do if she experienced any of them. There was no testimony to reflect whether an "ectopic pregnancy" was specifically mentioned during those oral instructions.

Plaintiff testified that she returned to work on Monday and worked a full week with no unusual physical symptoms. On Sunday, November 21, however, she arose at 10 a.m. and while brushing her teeth she suffered a sharp pain in her lower right side. She felt nauseous and collapsed on her way to the bedroom. She passed out several more times during the next few hours.

Plaintiff called her boyfriend, Henry Ortiz, told him she was not feeling well, and asked him to come to her apartment. When Mr. Ortiz arrived, he found plaintiff pale and unconscious on the floor. He called the paramedics, who transported plaintiff to Ravenswood Hospital.

Dr. Juan Vargas testified that he treated plaintiff at the hospital. On admission, plaintiff related that she recently had an abortion, that she had been bleeding for two or three days following the abortion, and that she had experienced a sharp pain that morning. When Dr. Vargas first saw plaintiff, she had all the symptoms of shock. He ordered emergency surgery. The surgery confirmed a ruptured ectopic pregnancy.

Dr. Steven Valfer performed the pregnancy termination procedure on plaintiff at the clinic. He testified that following an abortion the removed tissues are sent to a laboratory for analysis. Analysis is necessary to verify that the tissue is indeed pregnancy tissue and that no abnormal pregnancy tissue was removed. He explained that an absence of pregnancy tissue may mean that the woman was not pregnant, that she may have a molar pregnancy (an abnormal pregnancy that is a form of malignancy), that she may have miscarried, or that she may have a pregnancy some place other than in the uterus (an ectopic pregnancy). An ectopic pregnancy can occur in the fallopian tube. Dr. Valfer testified that if such a tubal pregnancy is untreated, several things may occur. The tissue may just resolve itself, in which case the woman may never be aware of the pregnancy. The pregnancy may abort itself or implant itself elsewhere inside the abdomen. The ectopic pregnancy may also rupture the fallopian tube, causing hemorrhaging which, if left unchecked,

may result in shock and death. Dr. Valfer stated that there may be nothing in the physical examination preceding the termination procedure which would indicate an ectopic pregnancy.

Dr. Valfer stated that he was responsible for reviewing the laboratory reports and instructing the clinic as to what should be done. He said that, although he instructed clinic personnel to contact patients whose pathology reports indicated possible ectopic pregnancies, it was not his responsibility to provide such notice to patients. He said that such notification was the responsibility of the clinic.

Dr. Valfer then referred to the pathology report on tissues removed from plaintiff. The report stated "Gestational endometrium and deciduous, Arias-stella phenomenon. Chorionic villi and trophoblast elements are not seen. Multiple recut sections, multiple levels, reveal no evidence of villi or trophoblast." Dr. Valfer explained that chorionic villi and trophoblast are definitive evidence of a pregnancy, and without their presence, one could not be sure whether all the tissue had been removed or whether there was any pregnancy tissue in the uterus. He testified that although these findings would lead him to suspect that there might be a pregnancy outside the uterus, the absence of these tissues is not sufficient to confirm a diagnosis of ectopic pregnancy. He characterized reports such as the ones here as "indicia for the physician to follow up on." Dr. Valfer testified that the fact that the laboratory had called the clinic with preliminary results probably indicated concern of laboratory personnel that there might be a tubal pregnancy which could cause bleeding.

The written preliminary laboratory report on plaintiff's tissue was received by the clinic on November 18, 1982. It contains a notation, added by Dr. Valfer, "to be examined and informed of possibility of ectopic pregnancy." Dr. Valfer testified this was his instruction to clinic personnel.

Walter Dragosz, the owner of the clinic, was questioned about clinic procedures. He testified that the clinic's practice was to ask a patient where she could be contacted. In most cases, the patient gave a home number, but the clinic would record multiple numbers if the patient provided them.

Dragosz was also questioned about the clinic's "Policy and Procedure Manual." That manual included the following guideline for physicians while in the procedure room:

"If an abortion is done and very little tissue is obtained, the patient must be counseled to come back for a pregnancy test and examination in one week. An explanation of this action is

necessary in order that the patient can be aware of the symptoms of and the steps needed to reduce complications from an ectopic pregnancy or incomplete abortion. Tissue from the procedure is submitted for microscopic examination. Aftercare instructions must be given orally or in written form which includes an explanation of symptoms indicating a possible complication."

Regarding tissue specimens, the manual included the following provision:

"All tissue specimens are sent to an independent laboratory for macro and microscopic determinations. Pathology reports are filed with the patient's chart and maintained as part of a permanent record."

The manual also contained the following concerning patient follow-up:

"Patients with unusual tissue specimens and/or other procedural problems are routinely scheduled at physician order to return to the clinic for an examination. Patients who are returning to their own physician, clinic and/or other source of medical care are asked to sign a release which enables us to forward a copy of her/his procedural records to her/his main source of health care prior to her/his checkup. These sources then complete a follow-up exam form on the patient and send it back to us and it is included in her/his file. The coordinator of referrals handles these forms."

There was no evidence presented that the amount of tissue removed from plaintiff during the termination procedure was such an unusually small amount of tissue to invoke the manual's provision instructing a physician to counsel for a one-week follow-up examination rather than the normal two- to three-week recommendation printed in the aftercare instructions. Plaintiff testified she did not make a follow-up appointment with the clinic because she wanted to see her own physician. While the record contains a release signed by plaintiff, no name is entered for plaintiff's follow-up health care provider.

Jeanne Dragosz, Walter's sister, testified that in 1982 she served as administrator of the clinic. She stated that laboratory testing of tissues was included in the charge for the pregnancy termination procedure. She testified that the clinic would contact a patient in the event of a questionable test result. She stated that the clinic did not treat ectopic pregnancies, since such treatment re-

quired surgery and hospitalization which could not be offered at an ambulatory clinic.

Jeanne Dragosz also testified that the clinic was State licensed and was inspected by the State in 1982. As part of that inspection, the State approved the clinic's policy and procedures manual.

Connie Perreault testified that she was a registered nurse who, in 1982, was employed by defendant's clinic. She said that when she was informed of plaintiff's laboratory test results, she contacted Dr. Valfer. His instructions, which she noted in plaintiff's record, were "ask for s & s. If +, send to E.R. If -, have pt come in to see Dr. Meyers." She explained that this meant the patient was to be asked if she had signs and symptoms of pregnancy or other symptoms, and if so, the patient should be sent to an emergency room. If the patient had no such signs or other symptoms, the patient should be told to come in to see Dr. Meyers, the clinic's medical director. Notations in plaintiff's medical records indicated three unsuccessful attempts to reach plaintiff by telephone regarding her laboratory results: two attempts on November 17 and one attempt on November 18, all at the telephone number given by plaintiff.

Those records also contained an undated letter which read "Dear Ruth: The results of your lab work done on 11/13/82 are in. Please call me at your earliest convenience." The letter was signed "Connie." Beneath the signature was the clinic's phone number. Perreault testified that although the letter in plaintiff's file was undated and there was nothing to definitively indicate that it was sent, her practice was to send such a letter to the patient, even when she contacted the patient by phone. She testified that, based on her usual practice, she probably sent the letter on November 18, 1982.

Anne Hohmeier was a counselor at the clinic. In that capacity, she would receive complaint calls for which she completed a form at the time of the call. She identified her written documentation of a telephone call received on November 23, 1982. That document was admitted as a business record over plaintiff's hearsay objection. Ms. Hohmeier stated that the caller identified himself as Henry Ortiz, plaintiff's fiance. He said he had found plaintiff lying on the floor and had taken her to a hospital where she had surgery. According to Ms. Hohmeier, Mr. Ortiz said that he had Connie's letter to plaintiff asking plaintiff to call about her laboratory results.

Mr. Ortiz then testified that he did call the clinic to speak with the doctor, but was told the doctor was unavailable. He denied receiving a letter from the clinic. Appellant, outside the statement of

facts, does not contend on appeal that the issue of whether the letter was sent is dispositive or that a finding that the letter was not sent would have been against the manifest weight of the evidence.

Counsel for defendant was permitted to read into the record the following State regulation which was in effect at the time of the events at issue here:

"All tissues removed during surgery shall be examined by a consulting pathologist and all X-rays shall be read by a consulting radiologist who shall provide a written report of his or her examination to the attending physician. A copy of this report shall be filed in the clinical record within seven days."

Defendant's motion for a directed verdict at the close of all the evidence was denied. The jury returned a verdict in favor of plaintiff, awarding her $25,000. This appeal followed the denial of defendant's post-trial motion for a directed verdict, judgment notwithstanding the verdict, and a new trial.

OPINION

On appeal, defendant contends testimony of a medical expert is required to establish the appropriate standard of care owed to plaintiff in this case as in all medical malpractice cases. Because plaintiff offered no expert testimony establishing the appropriate standard of care, defendant contends that the trial court should have granted defendant's motion for a directed verdict in its favor.

Plaintiff contends this is not a medical malpractice case, but one which could be decided on principles of ordinary negligence and that defendant's duty to notify her of the laboratory findings does not require a medical expert's evaluation and opinion.

■ Generally, expert testimony is required to support a charge of medical malpractice. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279, 282.) This is because assessment of the alleged negligence may require knowledge, skill, or training in a technical area outside the comprehension of lay persons. (See *Edelin v. Westlake Community Hospital* (1987), 157 Ill. App. 3d 857, 863, 510 N.E.2d 958, 961-62; see also *Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 594, 491 N.E.2d 803, 811.) In other words, the subject matter is so complicated that lay persons are not in an adequate position to assess whether a breach of duty has occurred. (See *Taber v. Riordan* (1980), 83 Ill. App. 3d 900, 906, 403 N.E.2d 1349, 1354.) Expert testimony is necessary whenever jurors who are not skilled in the practice of medicine would have difficulty, without assistance of medical evidence, in determining any lack of

necessary scientific skill on the part of a medical professional. (*Walski*, 72 Ill. 2d at 256, 381 N.E.2d at 282.) When expert medical testimony is required, Illinois courts apply the "similar locality rule" to determine the standard of care which is required of a medical practitioner, *i.e.*, the practitioner is required to exercise the same degree of knowledge, skill, and care which a reasonably well-qualified practitioner in the same or similar community would use under similar circumstances. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872.

A well-established exception to the general rule requiring expert testimony in medical malpractice cases is where the defendant's negligence is so grossly apparent or the treatment is so common that a lay person can readily appraise it using his or her everyday knowledge. (*Walski*, 72 Ill. 2d at 256, 381 N.E.2d at 282; *Taylor*, 142 Ill. App. 3d at 594, 491 N.E.2d at 810; *Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 158, 196 N.E.2d 355, 360.) This "gross negligence" or "common knowledge" exception has been applied only in certain limited situations. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05.) For instance, in *Newman v. Spellberg* (1968), 91 Ill. App. 2d 310, 234 N.E.2d 152, the court applied the exception where a doctor lifted a patient during a gastroscopic examination. The court stated:

"To us it is plain common sense and common knowledge, that when a patient is being held to assure that his torso is not moved while a foreign object such as a gastroscope is inserted into his innermost organs, injury would probably be sustained when an excessive or unnatural pressure was put upon his torso by lifting it against the force attempting to hold it in place. Here the uncontradicted testimony is that the sharp pain was first felt at the time plaintiff's torso was so lifted. It is a reasonable inference that it was at that time that the injury occurred." *Newman*, 91 Ill. App. 2d at 322, 234 N.E.2d at 158.

The "gross negligence" or "common knowledge" exception has also been applied in X-ray burn cases. (See *Holcomb v. Magee* (1920), 217 Ill. App. 272 (X-ray machine was known to be out of order); see also *Johnson v. Marshall* (1926), 241 Ill. App. 80 (no protective covering on eyes during X-ray treatment of nose).) In *Hall v. Grosvenor* (1932), 267 Ill. App. 119, a laparotomy sponge, 18 inches in length, was left inside a patient's abdomen following surgery. The court stated, "But it does not need the aid of expert testimony for any intelligent person to have an opinion as to the im-

propriety of leaving a foreign object in a wound, especially of the size of the sponge in the record before us." *Hall*, 267 Ill. App. at 122.

In *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392, the Illinois Supreme Court identified another exception to the rule that there must be expert testimony. The court allowed evidence of a manufacturer's instructions for the use of a certain drug, coupled with the physician's acknowledgement that he knew of those instructions, to establish the physician's duty without expert testimony as to standard of care. *Ohligschlager*, 55 Ill. 2d at 417-18, 303 N.E.2d at 396.

Some cases have found evidence of accreditation standards and hospital policy and regulations admissible, either alone or in combination with expert medical testimony, to establish a hospital's standard of care. See *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 332, 211 N.E.2d 253, 257 (hospital regulations, standards and bylaws performed much the same function as evidence of custom, although they did not conclusively determine the standard of care); *Smith v. South Shore Hospital* (1989), 187 Ill. App. 3d 847, 856, 543 N.E.2d 868, 872 ("certain professional guides, such as hospital licensing regulations, accreditation standards, bylaws and instructions for the use of drugs, may serve as a substitute for expert testimony"); *Taylor*, 142 Ill. App. 3d at 596, 599, 491 N.E.2d at 811, 813 (although regulations, standards and hospital bylaws are admissible as to standard of care, mere broad statements without reference to particular provisions are insufficient).

The "doctrine" of medical malpractice goes to the particular activity involved rather than the person performing the activity. (*Graham*, 46 Ill. App. 2d at 159, 196 N.E.2d at 361.) Because the nature of the allegedly negligent act determines whether the action is one of malpractice, the phrase "malpractice" can be interpreted to include negligence in the interrelated health care services. (See *Lyon v. Hasbro Industries, Inc.* (1987), 156 Ill. App. 3d 649, 654-55, 509 N.E.2d 702, 706; see also *Graham*, 46 Ill. App. 2d at 159, 196 N.E.2d at 361 (medical malpractice not limited to acts of physicians).) Where the alleged negligence is directly related to plaintiff's medical condition, the complaint is one for malpractice. (See *Kus v. Sherman Hospital* (1990), 204 Ill. App. 3d 66, 72, 561 N.E.2d 381, 384.) An assessment of what is required or necessary in light of that medical condition is inherently one of medical judgment and, as a result, necessitates expert testimony on the stand-

ard of care. *Lyon*, 156 Ill. App. 3d at 654-55, 509 N.E.2d at 706 (failure of an ambulance service to provide appropriate medical equipment was malpractice because the decision about which equipment was necessary for someone in plaintiff's condition involved medical judgment).

Plaintiff contends that the dispositive issue in this case is not one of medical malpractice, but of ordinary negligence, so that testimony of a medical expert is unnecessary. Plaintiff contends in her brief that this notice question "had nothing to do with an expert analysis of her medical condition, treatment or diagnosis." Although it is true that plaintiff raises no issue about the quality of treatment received while she was at the clinic, and she does not question the correctness of Dr. Valper's diagnostic conclusion of a "possible ectopic pregnancy," we find the case does require expert analysis of plaintiff's medical condition in order to fully define the proper standard of care.

The parties do not dispute that it is the urgency of the danger involved and the likelihood and extent of harm to the plaintiff which would dictate the extent of defendant's duty to notify plaintiff. (See analysis of *Phillips v. Good Samaritan Hospital* (1979), 65 Ohio App. 2d 112, 416 N.E.2d 646, later in this opinion.) These factors involve evaluation of plaintiff's medical condition and, therefore, must be established by expert medical testimony. (See *Walski*, 72 Ill. 2d at 256, 381 N.E.2d at 282 (expert testimony needed because jurors unskilled in practice of medicine would have difficulty determining lack of scientific skill on part of physician); *Taylor*, 142 Ill. App. 3d at 594, 491 N.E.2d at 811 (expert knowledge, skill or training needed to determine what action was required in light of patient's medical condition).) There was no testimony at trial as to the degree of likelihood of a tubal pregnancy, the likelihood that such a pregnancy would result in rupture of the fallopian tube, or the urgency involved in cases with laboratory results such as plaintiff's. Although testimony was offered as to the date of plaintiff's last menstrual period, there was no testimony indicating whether a tubal pregnancy can rupture the fallopian tube from the time of conception, or whether the danger arises at a certain point in the pregnancy. There was no testimony as to whether the danger was imminent. Such information requires technical, medical knowledge which is not within the common knowledge of jurors untrained in the medical profession. (*Taber*, 83 Ill. App. 3d at 906, 403 N.E.2d at 1354 (question of proper procedures to correct complications after surgery is a complex question not within common knowledge of

jurors).) Without such knowledge it is not possible for jurors, without the aid of medical experts, to reach any meaningful conclusions as to the extent of defendant's duty to notify, *i.e.*, how soon notification must normally be made to likely avert harm and how extensive defendant's attempts to notify must be.

As noted in *Kolanowski v. Illinois Valley Community Hospital* (1989), 188 Ill. App. 3d 821, 544 N.E.2d 821, where the proper standard of care is determined by plaintiff's medical condition, it involves medical judgment. (See *Kolanowski*, 188 Ill. App. 3d at 825, 544 N.E.2d at 824.) In *Kolanowski*, the plaintiff fell from his bed in a hospital's respite care facility. (*Kolanowski*, 188 Ill. App. 3d at 821-22, 544 N.E.2d at 821-22.) Although no medical treatment was being rendered to the plaintiff, the court held that expert testimony was necessary to determine the hospital's standard of care. The court wrote:

"Plaintiff's fall, it appears, was directly related to his medical condition. As indicated above, it has been previously determined in this State that the need for bed rails in light of a patient's medical condition is not a matter of common knowledge, but requires medical knowledge, skill, and training. *Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 491 N.E.2d 803.

Under the circumstances of this case, we find that the proper level of supervision and restraint were [*sic*] determined by the plaintiff's medical condition and therefore involved medical judgments. Accordingly, an expert's opinion regarding the defendant hospital's standard of care would have been required at trial." *Kolanowski*, 188 Ill. App. 3d at 825, 544 N.E.2d at 824-25.

Dr. Valfer testified that, in his opinion, it was generally the clinic's responsibility to notify patients of possible ectopic pregnancies. Evidence was also presented of the clinic's manual insofar that it stated "[p]atients with unusual tissue specimens are routinely scheduled at physician order to return to the clinic for an examination," from which some assumed duty to notify may arguably be inferred. (See *Darling*, 33 Ill. 2d at 332, 211 N.E.2d at 257, and its progeny (*Smith v. South Shore Hospital*, 187 Ill. App. 3d at 856, 543 N.E.2d at 872, and *Taylor v. City of Beardstown*, 142 Ill. App. 3d at 599, 491 N.E.2d at 813).) However, neither the manual nor Dr. Valfer in his testimony defined the nature or extent of such duty. Neither specified how soon notification must occur to likely avert the possible harm and how diligent and extensive the effort

to notify should be, in light of plaintiff's medical condition. Consequently, the jurors were simply left to speculate as to the proper standard of care which would apply to the facts of this case and in their determination as to whether defendant deviated from any such applicable standard. We also note that neither Dr. Valfer nor anyone else testified as to the standard of care under the "similar locality rule" which medical malpractice doctrine requires. See *Stevens v. Sadiq* (1988), 176 Ill. App. 3d 333, 338, 530 N.E.2d 1159, 1162 (it is not enough that a witness testifies as to his or her own personal standards).

That the issue is one of notice rather than of treatment does not alter the fact that a medical judgment is required. The case of *Tabor v. Riordan* (1980), 83 Ill. App. 3d 900, 403 N.E.2d 1349, is on point. *Tabor* involved the question of establishing a doctor's duties to notify a patient of post-operative complications and to refer the patient to a specialist for treatment of those complications. The plaintiff argued that expert testimony was unnecessary to establish those duties in that they were self-apparent. In affirming a judgment in favor of the defendant, the court stated, "The operation here involved, a cup arthroplasty, is a complicated procedure in which a layman would not be in an adequate position to assess whether the duty resulting after complications arose was breached." (*Tabor*, 83 Ill. App. 3d at 906, 403 N.E.2d at 1354.) In holding that expert testimony was required to establish the post-operative standard of care, the court analogized the post-operative duties to the duty to disclose under informed consent standards, stating:

> "The duty to inform of possible complications before an operation or course of treatment can be analogized to the duty to inform the patient afterwards of complications that have arisen. The same considerations of doctor-patient relationship are applicable. These include the ability of the plaintiff to understand complicated medical problems, psychological considerations as to the best interests of the patient, the extent of the doctor's own knowledge, and other factors which might affect not only the extent but also the timing of the information. These considerations also argue for the requirement that the duty of disclosure must be measured against applicable medical standards of disclosure in the professional community." *Tabor*, 83 Ill. App. 3d at 905, 403 N.E.2d at 1353.

See also *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 184, 262 N.E.2d 156, 161, and *Sheahan v. Dexter* (1985), 136 Ill. App. 3d

241, 248, 483 N.E.2d 402, 407 (expert testimony required in each case to establish standard of disclosure in informed consent cases).

The Ohio case of *Phillips v. Good Samaritan Hospital* (1979), 65 Ohio App. 2d 112, 416 N.E.2d 646, is even more explicitly on point. There a physician viewed a child's arm X rays, diagnosed no fracture, and recommended only aspirin and an elastic bandage. Subsequently, a radiologist viewed the X rays and diagnosed a fracture. (*Phillips*, 65 Ohio App. 2d at 113, 416 N.E.2d at 647.) The radiologist dictated his diagnosis for later reporting and mailing by a hospital secretary, but somehow the information was never communicated to the treating physician or to the child's parents. (*Phillips*, 65 Ohio App. 2d at 113-14, 416 N.E.2d at 648.) The court held that expert testimony was necessary to establish whether the radiologist had a duty to directly contact the treating physician with his diagnosis. (*Phillips*, 65 Ohio App. 2d at 117, 416 N.E.2d at 650.) The court stated:

> "The exigencies of the medical situation may call for correspondingly different levels of response. Severity of condition, urgency of treatment, potential for interim injury, suffering from delayed response, need for further analysis and consultation, and the patient's awareness of the extent of injury or the nature of the condition may all be relevant in ascertaining the necessary course of conduct in reporting a diagnosis. \*\*\* As we have stated, the form of communication depends on all the facts of the case and it is an issue best left to the trier of fact. It is particularly appropriate that the trier of fact make this assessment through the informed consideration of each indicium of medical fact, drawing what it believes to be the most reasonable inferences that in turn counsel the appropriate level of response.
>
> This appropriate level of response as to the need for communication must necessarily depend upon expert testimony in order to establish such factors as the immediacy of need for treatment as it relates to the diagnosis and the harm likely to result from inattention." *Phillips*, 65 Ohio App. 2d at 117, 416 N.E.2d at 649-50.

See also *Merriman v. Toothaker* (1973), 9 Wash. App. 810, 515 P.2d 509 (testimony of treating physician held to establish standard of care on facts similar to those in *Phillips*, but issue not raised as to whether expert testimony was necessary).

In *Nash v. Wilkinson* (1992), 1992 U.S. Dist. LEXIS 9458 (Ks. Dist.) (not reported in F. Supp.), a patient was treated and released

from an emergency room based on a tentative diagnosis of reflux esophagitis. (*Nash*, slip op. at 3.) When it was discovered that the patient's EKG report had been misinterpreted, the medical center unsuccessfully attempted to reach the patient by phone at his family's residence in the area and later at his home in Colorado. Through constant attempted telephone calls to the patient's home at 15-minute intervals, the patient was contacted 10 hours after the misdiagnosis was discovered. The patient sued the medical center and the doctor for failure to take appropriate, timely action to notify him of his cardiac condition so that emergency care could be obtained. *Nash*, slip. op. at 3.

The United States District Court, in granting the medical center's motion for summary judgment, held that expert testimony was required as to any deviation from the applicable standard of care. The court stated that "the extent of any duty to locate and notify [plaintiff] would be determined by the potential differential diagnosis of the EKG and the seriousness of the situation, and would require the testimony of an expert familiar with the standard of care applicable to hospital emergency departments." *Nash*, slip op. at 4.

■ The standard of care in this case regarding the duty of the clinic to notify the plaintiff is dependent on factors similar to those listed in the *Phillips* and *Nash* cases cited above. Each of those factors involves the application of medical judgment. This medical judgment encompasses an evaluation of plaintiff's medical condition, the imminency of harm, and the severity of possible consequences that would follow from deferred or delayed notification. These considerations are substantially medical in nature and cannot be determined by a lay jury alone without gross speculation.

Consequently, since no such medical testimony was provided to establish the standard of care regarding notification by the clinic, the verdict of the jury cannot be sustained. "Where a plaintiff has failed to produce any evidence on a vital element of the case, directing a verdict for defendants is proper and required." (*Stevens v. Sadiq* (1988), 176 Ill. App. 3d 333, 336, 530 N.E.2d 1159, 1161.) Because plaintiff has failed to present any expert testimony to establish the applicable standard of care, the trial court erred in denying defendant's motion for a directed verdict in its favor.

Reversed.

McNULTY and COUSINS, JJ., concur.