Certiorari Denied, May 2, 2014, No. 34,449

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:   2014-NMCA-056

Filing Date:  February 26, 2014

Docket Nos. 30,926 & 31,004 (consolidated)

TIMOTHY ANDREW RICHTER, Individually,
and as Personal Representative of the Estate of
KATHRYN LESLIE RICHTER, KRISTIN
LESLIE RICHTER, and DAVID JEFFREY RICHTER,

        Plaintiff-Appellant,

v.

PRESBYTERIAN HEALTHCARE SERVICES, and
REGIONAL LAB CORPORATION d/b/a TRI-CORE
LABORATORIES, RICHARD LOVATO, M.D., and
KEITH WINTERKORN, M.D.,

        Defendants-Appellees.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Nan G. Nash, District Judge

Law Office of Stephen Durkovich
Stephen G. Durkovich
Santa Fe, NM

Hunt Law, P.C.
MacKenzie Lee Hunt
Roswell, NM

for Appellant

Butt, Thornton, & Baehr, P.C.
Emily A. Franke
W. Ann Maggiore
Albuquerque, NM

1

Keleher & McLeod, P.A.
Charles A. Pharris
Thomas C. Bird
Marian B. Hand
Heather K. Hansen
Albuquerque, NM

Krehbiel Law Office, P.C.
Lorri Krehbiel
Melanie Frassanito
Albuquerque, NM

Allen, Shepherd, Lewis, Syra & Chapman, P.A.
Ben M. Allen
Richard E. Hatch
Sebastian A. Dunlap
Albuquerque, NM

for Appellees

## OPINION

**BUSTAMANTE, Judge.**

**{1}**     Kathryn Richter died in 2005 when she developed a heart arrhythmia during surgery intended to remove a tumor from her adrenal gland.  The heart arrhythmia was caused by an undiagnosed condition called pheochromocytoma.  Adding to the tragedy inherent in such a death, the parties discovered that during the course of a hospitalization in 2001, Mrs. Richter's then physicians ordered laboratory tests which were diagnostic of the condition that caused her death on the operating table.  The tests were never read or acted on by her physicians.

**{2}**     Plaintiff, Timothy Richter, as personal representative for his wife, brought a wrongful death action against Presbyterian Healthcare Services (PHS) and Regional Lab Corporation d/b/a Tri-Core Laboratories (TriCore), alleging negligent delivery of Mrs. Richter's laboratory test results in 2001.  Plaintiff also brought a medical malpractice action against the two physicians treating Mrs. Richter at the time of her death, alleging medical negligence in her treatment.  The district court granted some motions for summary judgment in favor of Plaintiff and some in favor of PHS and TriCore, and granted a partial directed verdict in favor of Dr. Winterkorn, one of Mrs. Richter's treating physicians.

**{3}**     Analysis of the summary judgment rulings requires us to evaluate whether Plaintiff can assert his claims against PHS and TriCore as matters of "ordinary" negligence not requiring expert testimony, or whether they of necessity involve professional negligence

2

which cannot be successfully pursued without experts. We conclude that certain aspects of Plaintiff's claims do not require expert testimony. We thus reverse the summary judgments as to those claims and affirm others.[1]

**{4}** We affirm the partial directed verdict in favor of Dr. Winterkorn primarily because Plaintiff did not present sufficient expert testimony to avoid it.

**{5}** Plaintiff also appeals the district court's decision to include Mrs. Richter's 2001 physicians on the special verdict form as non-party tortfeasors. This decision allowed the jury to compare the negligence of the 2001 physicians with that of the 2005 physicians even though Plaintiff could not seek damages against the 2001 physicians because the statute of limitations under the Medical Malpractice Act, NMSA 1978, § 41-5-13 (1976), had run. Concluding that including the 2001 physicians on the verdict form is consistent with New Mexico's approach to comparative negligence, we affirm this ruling of the district court.

**BACKGROUND**

**{6}** We provide a short summary of the facts and procedural posture of the case here. Additional details will be provided as appropriate during discussion of the issues.

**{7}** Mrs. Richter was admitted to PHS in April 2001 for treatment and testing related to cardiac symptoms. On April 16, 2001, Dr. Seligman, one of Mrs. Richter's physicians, ordered catecholamine and metanephrine testing on her urine to determine whether she might have an undiagnosed pheochromocytoma. TriCore was responsible for processing the results of Mrs. Richter's urine catecholamine and metanephrine testing (the Lab Results) and delivering the Lab Results to PHS. TriCore also had the responsibility to deliver the Lab Results to Mrs. Richter's physicians, although there is a conflict in the record as to which of her physicians should have received them.

**{8}** Because TriCore did not perform testing of the type requested by Mrs. Richter's physician, the sample was shipped to ARUP Laboratories in Utah. The first of the Lab Results was sent by ARUP to TriCore on Saturday, April 21, 2001, and the second on Sunday. The first test showed catecholamine levels 150 times higher than normal. ARUP's interpretation of the result included the notation "[m]assive elevation of catecholamines . . . . associated with . . . drug interferences, life-threatening illnesses, and neuroendocrine

---

[1]This is the third iteration of the Opinion in this case. Appellees Presbyterian Healthcare Services and Regional Lab Corporation each filed motions for rehearing after the first iteration was filed. Both motions for rehearing were denied on the merits, but the Opinion filed on August 26, 2013, was withdrawn and another substituted in its place on November 4, 2013. On December 10, 2013, Plaintiff filed an unopposed—albeit late—motion for clarification. The motion is granted and this Opinion is substituted for the November 4, 2013, iteration.

tumors." The second test showed catecholamine metabolite levels in excess of 100 times normal. The interpretation provided by ARUP included the notation "Massive elevations of metanephrine or normetanephrine . . . associated with . . . drug interferences, life-threatening illnesses, and . . . neuroendocrine tumors." These levels were diagnostic of pheochromocytoma.

{9}   Because TriCore did not operate on weekends, TriCore did not actually process the Lab Results and transmit them to PHS via the TriCore-PHS PACIS computer sharing system until 7:27 a.m. on Monday, April 23, 2001. TriCore records indicate that a hard copy of the Lab Results was printed for courier delivery to PHS at 11:06 a.m. that day. The record does not reveal whether the Lab Results were actually delivered to PHS that day or the next. Mrs. Richter was discharged from PHS at 2 p.m. on April 23, 2001. The record is unclear as to whether, at the time of Mrs. Richter's discharge, her chart was up-to-date or whether it indicated that her Lab Results were still pending. It appears from the record that Mrs. Richter's discharging physician—Dr. Ignacio Garcia—believed her results were still pending at the time of her discharge.

{10}   Approximately four years later, a CT scan ordered by Mrs. Richter's gastroenterologist disclosed a mass sitting atop her adrenal gland. Her gastroenterologist referred Mrs. Richter to Dr. Lovato for surgery to remove the tumor. Prior to surgery, Dr. Lovato asked Mrs. Richter's then primary care physician to perform catecholamine testing—the same test conducted in 2001—to determine if her adrenal tumor was a pheochromocytoma. Dr. Lovato then scheduled Mrs. Richter for an embolectomy, to be conducted by Dr. Winterkorn. Dr. Winterkorn conducted the embolectomy before Dr. Lovato had received the results of the catecholamine testing. Mrs. Richter died while under the care of Drs. Lovato and Winterkorn due to complications that arose when she developed an arrhythmia during the embolectomy procedure.

{11}   Plaintiff filed suit against PHS, TriCore, Dr. Lovato, and Dr. Winterkorn. Plaintiff and TriCore litigated at length in the early stages of the case as to whether TriCore was a qualified health care provider under the Medical Malpractice Act and whether TriCore's services constituted medical care under the Act. The district court first denied TriCore's motion to dismiss but granted a stay of the litigation and ordered Plaintiff to take his claim before the Medical Review Commission "for purposes of the procedural prerequisite."

{12}   Plaintiff subsequently filed three motions for summary judgment on the issue of whether the Medical Malpractice Act applied to his claims. In the first, he argued that TriCore was not a qualified health care provider under the Act. This motion was denied. The second motion asserted that the conduct Plaintiff alleged in his complaint did not constitute medical care under the Act. In the third motion, Plaintiff made additional arguments for his position that TriCore was not a health care provider under the Act. The district court heard argument on the second and third motions together. It ruled that TriCore's acts in delivering the Lab Results were not medical acts but instead were "ministerial" acts subject to ordinary negligence or negligence per se review and granted the

4

second motion. Given this determination, the district court decided that the issue of whether TriCore was a health care provider under the Act was moot and did not rule on the third motion.

**{13}** A few days prior to trial, the district court found that "[t]here [are] no genuine issues of material fact as to the claims of negligence as against PHS and TriCore," granted summary judgment in favor of PHS and TriCore, and dismissed the complaints against them. At the close of Plaintiff's case in chief, the district court granted a partial directed verdict in favor of Dr. Winterkorn on Plaintiff's medical negligence claim regarding Dr. Winterkorn's decision to continue the embolization procedure after Mrs. Richter developed an arrhythmia. During trial on the remaining claims against Drs. Lovato and Winterkorn, testimony was presented asserting that Plaintiff's 2001 PHS physicians were comparatively negligent. For comparative negligence purposes, the 2001 physicians were identified as non-party tortfeasors on the jury's special verdict form. The jury returned a verdict against Dr. Lovato and in favor of Dr. Winterkorn. The jury also found the four 2001 physicians negligent. Plaintiff timely appealed.

## DISCUSSION

**{14}** On appeal we address four major questions. The first is whether Plaintiff's claims against TriCore and PHS sound in ordinary negligence rather than medical malpractice. Second, we address whether the district court properly granted motions for summary judgment and dismissal in favor of TriCore and PHS. The third issue is whether the district court improperly limited opinion testimony by a treating physician about Dr. Winterkorn and properly directed a verdict in favor of Dr. Winterkorn. The fourth and final issue is whether the district court erred when it permitted the jury to compare the alleged negligence of non-parties with the negligence of Drs. Lovato and Winterkorn.

## I.     Plaintiff's Claims of Ordinary Negligence

**{15}** Before we analyze the summary judgments in favor of TriCore and PHS, we must address whether Plaintiff's claims against them can be brought and pursued as "ordinary" negligence actions not requiring expert testimony. This preliminary discussion is necessary because, even though the district court apparently analyzed the motions only under an ordinary negligence standard, TriCore and PHS argued below that Plaintiff's claims could only be established through expert testimony. On appeal TriCore requests, pursuant to Rule 12-201(C) NMRA, that we review the district court's ruling even though it did not file a cross-appeal on the issue. We agree that Rule 12-201(C) permits us to do so.

**{16}** PHS also suggests that we overrule the district court's application of ordinary negligence standards to it. Although PHS made this argument to the district court, the district court never ruled specifically on the standard applicable to PHS, and PHS never invoked a ruling on the issue. Thus, PHS is not on the same footing as TriCore. As such it is likely that PHS did not preserve the issue sufficiently to rely on Rule 12-201(C).

5

Nevertheless we shall address the issue because it is otherwise properly before us as to TriCore.

**{17}** Our analysis leads us to conclude that Plaintiff can proceed on some of his claims relying on an ordinary negligence theory and eschewing expert testimony. But the range of acts and failures to act he can pursue as an ordinary negligence claim is narrower than he has attempted thus far. We explain.

**{18}** We start by noting that New Mexico courts have not previously considered the particular claims brought here. Plaintiff does not assert that the testing was improperly conducted or interpreted. He is concerned solely with the proper delivery of the Lab Results. None of our prior cases have dealt with a claim of negligence in the delivery of medical laboratory test results to a patient's physicians. To that extent we are presented with a question of first impression. The issue provides us an opportunity to explore the general problem of how to distinguish between issues and claims which must be proven by expert testimony and those which are susceptible to proof without expert testimony.

**{19}** Our cases recognize that "[i]t is not mandatory in every case that negligence of the doctor be proved by expert testimony . . . ." *Pharmaseal Labs., Inc. v. Goffe*, 1977-NMSC-071, ¶ 17, 90 N.M. 753, 568 P.2d 589. This notion can be extrapolated to most if not all circumstances involving medical treatment. *See* Wade R. Habeeb, Annotation, *Necessity of Expert Evidence to Support Action Against Hospital for Injury to or Death of Patient*, 40 A.L.R. 3d 515 (1971). The idea is reflected in our uniform jury instructions describing the duties of hospitals and doctors. The first paragraph of UJI 13-1119A NMRA explicitly refers to an "ordinary care" standard while the second paragraph describes situations involving the possession and use of special knowledge and skills which require expert proof. The Use Note to UJI 13-1119A cautions that the second paragraph "should be omitted in those cases in which the court determines that expert testimony is not required and negligence can be determined by resort to common knowledge ordinarily possessed by the average person." This direction echoes language used in *Goffe*, 1977-NMSC-071, ¶ 17, describing when expert testimony is not necessary. *See also* UJI 13-1101 NMRA cmt. 5 ("The final paragraph is included in brackets to make it clear that expert testimony is not required if the jury can decide[] the matter based on its common knowledge without the need for medical or scientific expertise.").

**{20}** The difficulty with these formulations is that they do not provide much guidance for trial courts to use in making the assessment. The language is instead quite circular: expert testimony is required—except when it is not.

**{21}** We have not found any New Mexico authority involving tort claims that expands on the *Goffe* language. Our Supreme Court did consider the meaning of the phrase "professional services" in the context of deciding whether a doctor's sexual assault of a patient in the course of treatment would come within the coverage of a malpractice insurance policy. *N.M. Physicians Mut. Liab. Co. v. LaMure*, 1993-NMSC-048, ¶ 12, 116 N.M. 92,

860 P.2d 734. We, of course, appreciate the difference in context between liability insurance coverage and a tort action. But we believe the Supreme Court's approach to defining covered "professional services" offers a path to a workable test for distinguishing medical or professional negligence claims from ordinary negligence claims.

**{22}** In resolving the coverage issue, the Supreme Court cited approvingly to a definition found in *Marx v. Hartford Accident & Indemnity Co.*, 157 N.W.2d 870 (Neb. 1968). The Nebraska court defined "professional services" in large part using a functional test, as follows:

> Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. . . . In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself.

*Id.* at 871-72. We interpret this as a functional test because it is concerned with the skills, knowledge, and acts necessarily used to decide on a course of action. If the act involves the use of specialized knowledge or skill to make a judgment call as to the appropriate thing to do or not do, expert testimony will likely be needed to assess the resultant act or failure to act. If not, expert testimony is not required.

**{23}** This functional inquiry gives content to the idea that "[n]ot all cases involving health or medical care automatically qualify as medical malpractice claims." *Estate of French v. Stratford House*, 333 S.W.3d 546, 556 (Tenn. 2011). It has been used in settings including nursing homes, psychiatric facilities, and hospitals. *See id.* at 556, 559 (holding that negligence in providing basic care for residents which did not involve the exercise of medical judgment or skill did not constitute an instance of malpractice and could be proven without expert testimony); *Joseph v. Univ. Behavioral LLC*, 71 So. 3d 913, 917 (Fla. Dist. Ct. App. 2011) (stating that for a claim to constitute medical malpractice "[t]he wrongful act must be directly related to the improper application of medical services and the use of professional judgment or skill"); *Gould v. N.Y. City Health & Hosps. Corp.*, 490 N.Y.S.2d 87, 89 (N.Y. Sup. Ct. 1985) ("If a hospital's employee's acts require professional skill and judgment, then the complaint sounds in malpractice for which the hospital may be held liable. Otherwise, the triers of fact are presented with issues of ordinary negligence.").

**{24}** Of course, whether a claim involves ordinary negligence or medical malpractice is a fact-dependent inquiry. *See* UJI 13-1119A Comm. cmt. ("Distinguishing claims that need not be established by expert testimony from those that must is a task to be accomplished by the trial judge on a case[-]by[-]case basis."); *see also Estate of French*, 333 S.W.3d at 556 ("[W]hether claims should be characterized as ordinary negligence or medical malpractice claims obviously depends heavily on the facts of each individual case."); *Joseph*, 71 So. 3d at 917 ("A court must, on a case-by-case basis, look to the allegations in the complaint when

determining whether a suit raises an issue of ordinary negligence or medical malpractice.").

{25}    We see no reason why this functional approach should not be applied to TriCore and PHS. And, in fact, it appears that the district court applied a variant of this analysis when it ruled that TriCore's acts or failures to act in delivering the Lab Results were not medical but, rather, were "ministerial" in nature.

## A.    TriCore

{26}    We apply the functional approach to TriCore first. Medical testing laboratories undoubtedly have a general duty to deliver reports generated by them. This statement, of course, merely begs the more vexing questions of who should receive copies and the reasonableness of the timing of the delivery. Though it does not involve a testing laboratory directly, *Schindel v. Albany Medical Corp.*, 625 N.E.2d 114 (Ill. App. Ct. 1993) is illustrative. In *Schindel*, the plaintiff sought damages for a ruptured fallopian tube caused by an ectopic pregnancy. *Id.* at 115. The clinic did not contact the plaintiff with the results of the lab report that indicated the pregnancy for a period of eight days. *Id.* at 115-16. The plaintiff presented no expert testimony concerning the significance of the delay. *Id.* at 118. On appeal the jury verdict in the plaintiff's favor was overturned because of the lack of expert testimony. *Id.* at 122. The court noted that "it is the urgency of the danger involved and the likelihood and extent of harm to the plaintiff which would dictate the extent of [the] defendant's duty to notify [the] plaintiff." *Id.* at 120. Evaluation of the urgency of the situation required the exercise of medical judgment and had to be established by expert testimony. *See also Sinclair v. Quest Diagnostics, Inc.*, No. 000062320S, 2000 WL 573186, at *3 (Conn. Super. Ct. Apr. 25, 2000) (mem.) (holding that expert testimony was required to establish that a two week-delay in conducting and reporting the results of an amniocentesis was negligence).

{27}    On the other end of the scale is *Morgan v. Laboratory Corp. of America*, 844 N.E.2d 689 (Mass. App. Ct. 2006). In *Morgan*, the plaintiff brought a negligence claim against a testing laboratory for failing to provide prompt notice to his doctor that the laboratory's analysis of his blood sample had revealed life-threatening changes in the anticoagulation level of his blood. *Id.* at 695-96. The defendant argued that there was insufficient evidence of negligence because the plaintiff failed to present expert testimony that its conduct "breach[ed] the proper standard of care." *Id.* at 695. The court disagreed, stating "Here, the plaintiffs' actions against [the defendant] concerned neither an allegation of a missed diagnosis nor the failure to institute policies and procedures for the reporting of life-threatening results. Rather, it was based upon alleged inadequacies in the actual reporting of indisputably urgent test results." *Id.* "Moreover, . . . the reporting responsibility lay with [the defendant's] administrator, whose job functions required no special training or skill comparable to that of a physician or other licensed professional." *Id.* The court held that because of the specific allegations in the complaint, "[t]he jury were thus capable of determining, without the assistance of an expert, whether or not [the defendant's] conduct was reasonable under the circumstances." *Id.* at 695-96.

8

**{28}** We draw from these cases two principles. First, challenges to the timing of the delivery of laboratory reports will normally require expert testimony, except when the required timing is set by a known standard such as internal policy, contract, or governmental regulation. Second, expert testimony will not be required if the asserted negligence is based on a standard of reasonable care which does not require professional interpretation. For example, when—as is the circumstance in this case—there is an established routine procedure regarding the delivery of reports to certain doctors, any asserted negligence in failing to deliver the reports to the specific doctors would be based on a breach of the standard of reasonable care because no professional interpretation would be needed regarding the requirement that the reports be delivered to the ultimate recipients.

**{29}** This summary has obvious consequences in this case. Many of Plaintiff's points or instances of asserted negligence involve the timing of delivery of the Lab Reports. Timing challenges almost by definition require an assessment of urgency, and that assessment requires expert testimony. Similarly, Plaintiff's points about the efficiency and design of the delivery system, to the extent they are prompted by timeliness concerns, require expert testimony. Thus, expert testimony would be required where Plaintiff's claims addressed the timeliness or urgency of the delivery of the Lab Reports, including any timeliness claims that involve the efficiency and design of TriCore's delivery system.

### B. PHS

**{30}** We turn now to the claims against PHS. As we noted above, they are different from those against TriCore.[2] Plaintiff cites no case determining that hospitals in general have a duty to deliver laboratory reports to their patients' physicians—at least not the kind of duty laboratories such as TriCore have. Our research has revealed authority that hospitals have no duty to "personally notify every patient's treating physician of every test result, even when [the] patient has been discharged." *Edwards v. Brandywine Hosp.*, 652 A.2d 1382, 1387 (Pa. Super. Ct. 1995)

**{31}** But hospitals do have a clearly established duty to maintain their patients' medical charts in good order, and that duty includes posting completed lab tests as received. The court in *Johnson v. Hillcrest Health Center, Inc.*, 2003 OK 16, 70 P.3d 811, aptly described the function and importance of the patient chart.

> The obvious purpose of the charting requirement is to provide a record to assist the physician in properly treating the patient. Physicians depend on the

---

[2]In saying this we are not forgetting an undecided motion for summary judgment on joint venture which the district court deemed moot after it granted summary judgment in favor of PHS and TriCore. We, of course, venture no opinion as to the merits of the motion or its effects on the potential liability of TriCore and PHS if granted.

reliability and trustworthiness of the chart. As far as a hospital is concerned, there is no more important record than the chart for indicating the diagnosis, the condition, and the treatment required for patients. In our view, no degree of knowledge or skill is required other than that possessed by the average person to conclude that the applicable standard of care required the hospital to include completed lab tests and lab reports in the patient's chart to aid the doctor in diagnosing and treating the patient—regardless of whether lab tests are made available on the computer.

*Id.* ¶ 15 (footnote omitted).

**{32}** We agree with the *Johnson* court's conclusion that assessing a hospital's compliance with its charting duty does not require expert testimony. Thus this portion of Plaintiff's claims against PHS can be brought as an ordinary negligence claim. In this context timeliness in the form of maintaining the chart does not implicate the kind of urgency that would require the exercise of professional judgment.

## II.     Summary Judgment in Favor of Tricore and PHS Reversed in Part

**{33}** PHS and TriCore both filed motions for summary judgment in response to Plaintiff's complaint. Their motions for summary judgment asserted that no breach of duty had occurred, that Plaintiff's claim must be addressed as medical negligence rather than ordinary negligence, and that Plaintiff had failed to present a qualified expert to testify regarding the proper duty of care required for medical negligence. The district court granted the motions for summary judgment, finding that Plaintiff "failed to make a showing of any breach by either [PHS] or TriCore of its duty of care in reporting lab results." We review de novo a district court's grant of summary judgment, construing the evidence most favorably to the non-moving party. *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146; *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 5, 137 N.M. 339, 110 P.3d 1076. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "If the facts are undisputed and only a legal interpretation of the facts remains, summary judgment is the appropriate remedy." *Bd. of County Comm'rs v. Risk Mgmt. Div.*, 1995-NMSC-046, ¶ 4, 120 N.M. 178, 899 P.2d 1132. "Summary judgment should not be granted when material issues of fact remain or when the facts are insufficiently developed for determination of the central issues involved." *Vieira v. Estate of Cantu*, 1997-NMCA-042, ¶ 17, 123 N.M. 342, 940 P.2d 190.

**{34}** Our discussion above concerning the type of claims Plaintiff can pursue without relying on expert testimony simplifies our task in considering the propriety of the summary judgments. We address TriCore first.

## A.     TriCore

**{35}** The great majority of TriCore's "Statement of Uncontroverted Facts" concerns matters of timing. Some address the lack of any internal standards for the timing of delivery (nos. 7-10) while others address the idea that nothing about the Lab Results themselves imposed any need for action outside TriCore's routine practice (nos. 11-17). In accordance with our discussion above, the matters involving relative urgency require expert testimony. Because Plaintiff presented none, summary judgment was appropriate as to those claims. With regard to TriCore's compliance with internal standards of promptness, we agree that Plaintiff did not demonstrate a question of fact and summary judgment was appropriate as to these claims also.[3]

**{36}** The issue as to which of Mrs. Richter's physicians should have received a copy of the Lab Results requires a different result. TriCore noted in its motion for summary judgment that one of Plaintiff's claims was that "TriCore was obligated to notify Plaintiff's physicians of abnormal test results personally." TriCore's motion for summary judgment thereafter simply ignores the issue of who should have received the Lab Results. It could be argued that TriCore did not even make out a prima facie case for summary judgment on this issue. We need not rely on that rubric to resolve the issue, however. Plaintiff demonstrated an issue of material fact by citing testimony from PHS's vice president for operations and TriCore's medical director that as a matter of routine procedure, the Lab Results should have been delivered to the ordering physician and the treating physicians. The ordering physician was Dr. Seligman. It is undisputed that he did not receive a copy of the Lab Results at any time from 2001 until after Mrs. Richter's death. Dr. Seligman described the Lab Results as indicating significant abnormalities requiring further evaluation. He also characterized the Lab Results as reflecting "critical values." TriCore's medical director did not know why the ordering and treating physicians did not receive a copy of the Lab Results.

**{37}** This record is sufficient for us to determine that summary judgment was improper with regard to TriCore's delivery of the Lab Results to all the physicians who should have received them. No expert testimony is needed to prove this claim. *See Morgan*, 844 N.E.2d at 695. And, as is the norm with ordinary negligence cases, issues as to breach and causation are within the realm of the jury to decide. *Lessard v. Coronado Paint & Decorating Ctr., Inc.*, 2007-NMCA-122, ¶ 27, 142 N.M. 583, 168 P.3d 155. TriCore's negligence regarding the delivery of the Lab Results to physicians who should have received them must now be addressed by the district court on remand.

**B.     PHS**

---

[3]TriCore also argued in its Answer Brief that the district court erred in not granting its motion to dismiss based on the statute of limitations under the Medical Malpractice Act. Because we hold that the claims based on the Act were properly dismissed, we need not address the issue of the statute of limitations.

**{38}** We turn now to PHS. PHS's motion for summary judgment relied on four basic points: (1) In the absence of results reflecting critical values under the Clinical Laboratory Improvement Amendments (CLIA), 42 C.F.R. § 493.1291(g) (2012), it had no duty to give any notice to Mrs. Richter's physicians; (2) PHS fulfilled whatever duty it had by making the test results available to the physicians by computer access on the morning of April 23, 2001, and by placing the chart copy in the patient's chart when it was delivered by TriCore Laboratory; (3) its Rule 11-406(A) NMRA evidence of its habitual handling of lab results created a presumption that it followed that habit in this case; and (4) Mrs. Richter's physicians had their own duty to follow up on the test results.

**{39}** PHS's argument concerning its duty under CLIA is well taken. Plaintiff does not argue at this point that the Lab Results met the CLIA standard for critical values and its attendant need for immediate delivery of results. To the extent the summary judgment was based on this ground, it was proper.

**{40}** We disagree that summary judgment was proper as to the second ground. While it is undisputed that the Lab Results were transmitted to the PHS PACIS computer at 7:17 a.m. on April 21, Plaintiff raised at least two questions of fact as to whether that delivery was effective and whether it was properly handled by PHS upon receipt. The question of effectiveness arises from the unresolved issue of whether and how physicians had access to or used the computer records to review patient records. Plaintiff presented testimony from a TriCore-designated expert that in 2001 PHS did not have an electronic medical record from which physicians would retrieve lab results. Plaintiff also presented the testimony of a physician who stated that in 2001, physicians did not use the computer to access lab results. This testimony, combined with the undisputed fact that in 2001 the printed or hard copy of lab results was the official copy of such results, creates a classic question of fact whether receipt of the Lab Results on PHS's computer system by itself constituted compliance with its duty to exercise ordinary care to keep patient charts up to date. *Johnson*, 2003 OK 16, ¶¶ 15-18.

**{41}** Perhaps the most salient and difficult question regarding PHS's position, however, is that it did not demonstrate that the computer system—if it had been checked—would have informed Mrs. Richter's physicians that the Lab Results were in. There is an unresolved question whether the computer system reflected that the Lab Results were "pending" throughout the day that Mrs. Richter was discharged. The "pending" notation was a message to everyone that tests had been ordered but results not yet received. PHS did not make an actual showing or present evidence that receipt of the Lab Results on PHS's computers resulted in a change of the "pending" signal in the system.

**{42}** Whether the computer continued reflecting that the Lab Results were "pending" and whether the system should have been designed to reflect a "received" signal upon transfer of results from TriCore does not require expert testimony. And they are questions of material fact making summary judgment improper with regard to PHS's duty to reasonably maintain its patient charts.

**{43}**    Similarly, there are questions of fact raised by the record which undermine PHS's Rule 11-406(A) habit evidence. "Courts may accept Rule 406 [(habit)] evidence at the summary judgment stage as providing an inference that a routine practice was actually carried out. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261-62 (10th Cir. 2012), *cert. denied,* _ U.S. _, 133 S. Ct. 2009 (2013). PHS's habit evidence permits an inference that it followed its ordinary practices in handling Mrs. Richter's Lab Results, which "would have resulted in delivery of a hard copy of the results to the nursing station . . . on April 23rd or 24th of 2001, where a nurse or a ward clerk would file the results in [Mrs.] Richter's patient chart." But even if we accept that the habit evidence created this inference, Plaintiff provided evidence to rebut it. Plaintiff asserted below that "[t]he hard copy of Mrs. Richter's Lab Results actually found in her archived chart [is dated] May 1, 2001, more than a week after her discharge." Plaintiff also pointed to PHS's admission that it "cannot ascertain from the available records when the test results were communicated." In addition, although not addressed in the response to motion for rehearing, Plaintiff stated in his reply brief that none of Mrs. Richter's treating physicians had ever "seen Mrs. Richter's test results at any time until after her death in 2005[.]" We view these facts in the light most favorable to trial. *Woodhull v. Meinel*, 2009-NMCA-015, ¶ 7, 145 N.M. 533, 202 P.3d 126. Thus, even if PHS's habit evidence permitted an inference in its favor, Plaintiff provided facts sufficient to create a genuine issue of fact as to whether the Lab Results were actually received and filed at the nurses' station before Mrs. Richter was discharged. Thus, judgment as to whether PHS properly handled the hard copy of the results was improper.

**{44}**    In its motion for rehearing PHS argues that reliance on *Johnson v. Hillcrest Health Care Center, Inc.*, 2003 OK 16, 70 P.3d 811, is improper because "[Plaintiff's] case never rested on any claim or evidence showing that PHS failed to file the test results properly after delivery of the paper copy by Tri-Core's courier to [Mrs.] Richter's nursing station" and that "[Plaintiff's] case against PHS alleged improper delivery management practices, not inadequate filing once [L]ab [R]esults were delivered." This argument hinges on an overly narrow interpretation of the term "charting requirement" to include only the actual filing of results. As used in *Johnson* and in this Court's Opinion, "charting" includes both delivery and filing of results in the chart. *See id.* 2003 OK 16, ¶ 9 (stating that the plaintiff there argued that the hospital "alleged failure to post the lab tests and the lab report *to [the plaintiff's] husband's chart* and/or call them to the doctor's attention before [the plaintiff's husband] was discharged" was negligent" (emphasis added)); Opinion ¶ 32 (stating, "hospitals do have a clearly established duty to maintain their patients' medical charts in good order, and that duty includes posting completed lab tests as received"). Similarly, as PHS acknowledges elsewhere in its motion, Plaintiff alleged—with support in the record—that the results were neither delivered nor filed. In addition, PHS appears to acknowledge that "charting" involves both delivery and filing by repeatedly arguing that its habit evidence demonstrated that it did both. This argument is therefore unavailing.

**{45}**    Finally, we reject PHS's fourth argument—that the physicians' duty to follow up on ordered lab tests acts to shield it from liability entirely. We agree that the physicians had a duty to follow up. But any failure on their part to comply with their independent duty cannot

13

absolve PHS of its failure to comply with its duties. At most the negligence of the physicians is subject to a comparative analysis. *See Martinez v. First Nat'l Bank of Santa Fe*, 1987-NMCA-114, ¶ 12, 107 N.M. 268, 755 P.2d 606.

**{46}** We conclude that summary judgment in favor of PHS was proper to the extent that it was granted based on an absence of duty to report under CLIA. However, summary judgment as to the use of the computer system to report results was improper because there were genuine issues of material fact on how that system functioned or should have functioned. Finally, PHS was not relieved of its duty to Mrs. Richter simply because the ordering physicians had a duty to follow up on the Lab Results. Further proceedings regarding PHS's negligence must also be addressed by the district court on remand.

## III.    Rulings Related to Dr. Winterkorn

**{47}** Plaintiff articulated three theories of malpractice against Dr. Winterkorn. Two claims involving presurgery decisions were submitted to the jury. The district court granted Dr. Winterkorn's motion for directed verdict on the third theory—that Dr. Winterkorn was negligent in continuing with the surgery after Mrs. Richter developed an arrhythmia during the surgery.

**{48}** Plaintiff asserts that the district court improperly prevented "Dr. Lovato from testifying as to Dr. Winterkorn's negligence." We disagree with Plaintiff's argument concerning Dr. Lovato's testimony because we see no abuse of discretion in the ruling. As a separate matter, Plaintiff argues that a directed verdict was improper because (1) Dr. Winterkorn committed medical negligence when he continued with the embolization procedure after Mrs. Richter had developed arrhythmia and that his explanation for why he continued betrays such a basic misunderstanding of the procedure that it constitutes—and here we paraphrase—negligence per se, allowing jury review; and (2) Dr. Winterkorn's promise to stop the procedure if Mrs. Richter developed an arrhythmia was sufficient to allow the claim to be heard by the jury. We disagree with Plaintiff's arguments concerning the directed verdict because they do not address the fact that Plaintiff simply did not present enough admissible evidence to avoid dismissal.

## A.    Exclusion of Dr. Lovato's Opinion Testimony Was Not an Abuse of Discretion

**{49}** Plaintiff called Dr. Lovato as an adverse witness. Among other topics, Plaintiff "questioned Dr. Lovato about his and Dr. Winterkorn's decision to proceed with Mrs. Richter's embolization not knowing her catecholamine test results and despite 'panic-value' potassium levels, which posed a likely chance of death if any surgical procedures were undertaken on her that day." After a series of questions exploring who made the decision to proceed with surgery that morning, Plaintiff asked a question meant to elicit an opinion from Dr. Lovato as to which acts of Dr. Winterkorn were negligent. The following colloquy occurred:

14

| | |
|---|---|
| [Plaintiff]: | Isn't it true that Mrs. Richter died, not because of her pheochromocytoma, but because of the treatment that was given her on the 26th, by Dr. Winterkorn? |
| [Defendant]: | Objection, your Honor.  Calls for expert testimony. |
| [Plaintiff]: | I believe he's the treating physician. |
| [Court]: | Approach.  If you're asking a treating physician to render an ultimate conclusion on another treating physician, I think I ruled that I was not going to allow treating physicians to testify as to that.  Only the expert physician can testify—or the physicians who have been designated as experts.  I think that's what my ruling was. |
| [Plaintiff]: | That's what you're saying now.  That wasn't the ruling before.  It was the ruling with Dr. Gurule, and only with respect to Dr. Gurule. |
| [Court]: | Then I will extend that ruling.  This is also a treating physician.  He's one of the [D]efendants on trial and you're asking him to testify to the ultimate conclusion that—of the [P]laintiff. |

Plaintiff argues that limiting his ability to elicit opinions from one of the treating physicians against another tilted the field unfairly in Dr. Winterkorn's favor.  Plaintiff bases this argument partly on the circumstance that later in the trial Dr. Winterkorn was asked to opine—without objection from anyone—on the negligence of other defendant doctors, including Dr. Lovato.

**{50}**   Plaintiff makes only one argument that raises a colorable challenge to the district court's ruling.  Plaintiff essentially argues that, in a case such as this, treating physicians should be allowed to provide opinions on the ultimate issues of professional negligence by others because they are almost by definition experts.  Plaintiff argues that treating physicians should not be required to be disclosed or listed with "ordinary 'retained' experts" in pretrial witness disclosure documents.  Instead, Plaintiff asserts, "treating physicians are usually listed elsewhere with the attending notification that they will be asked questions about or will [testify] about the matters at issue in the case."

**{51}**   Consistent with this approach, Plaintiff listed the treating physicians separately from the witnesses and in a footnote to the witness list stated:

The witnesses set forth in this designation are all treating physicians.  Mr.

15

Richter has no control over these witnesses. They do have opinions about Mrs. Richter's care arising from their treatment of Mrs. Richter and their knowledge of the circumstances of such treatment. Mr. Richter will be asking for their opinions on these issues as well as how lab results are communicated to a patient's physician.

Plaintiff included a more limited observation to the same effect in his notice of expert witness availability.

**{52}** One difficulty for Plaintiff on appeal is that he did not mention these matters to the district court during the argument following the objection to his question seeking an opinion from Dr. Lovato. Plaintiff's failure to raise the argument at this juncture leads us to conclude that the argument was likely not preserved. *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717.

**{53}** Further, Plaintiff was at that point on explicit notice of the district court's approach to the scope of opinion testimony she would allow from treating physicians who had not been identified as "expert" witnesses. In response to a motion in limine filed by Dr. Lovato, the district court had earlier ruled that Plaintiff would not be allowed to elicit testimony from co-defendant Dr. Gurule as to the "standard of care and breach thereof by Drs. Lovato or Winterkorn." The district court's ruling relied on the fact that Dr. Gurule had not been identified as an "expert" witness by Plaintiff or any other party. The district court recognized that Dr. Gurule's "lay" testimony would be based on his specialized knowledge as a physician and percipient witness. Thus, the district court's order permitted Dr. Gurule to be questioned about: (1) "his knowledge of [Mrs.] Richter"; (2) "her condition as he observed it"; (3) "her cause of death"; (4) "her underlying cardiac condition"; and (5) "the etiology of that condition." The rationale of the order concerning Dr. Gurule applied directly to Plaintiff's questioning of Dr. Lovato. In sum, we find no abuse of discretion in the district court's ruling limiting Dr. Lovato's testimony.

**{54}** Finally, we do not see how the limit on Dr. Lovato's opinion testimony—even if erroneous—could require reversal. Dr. Lovato could only have opined concerning Dr. Winterkorn's presurgery decision. Dr. Lovato himself explained that he could not speak to what Dr. Winterkorn should or should not have done during the surgery. Dr. Lovato was allowed to testify fully as to his version of the presurgery events, including that it was Dr. Winterkorn's decision to start the surgery in the face of Mrs. Richter's potassium levels and the lack of results on the catecholamine testing.

**{55}** The presurgery theories of malpractice against Dr. Winterkorn were submitted to the jury. The jury instruction read:

4. Dr. Winterkorn was medically negligent in proceeding with the embolization procedure without knowing that the pheochromocytoma test results were negative.

16

5.      Dr. Winterkorn was medically negligent in failing to do a proper pre-procedure cardiologic work up.

6.      Dr. Winterkorn was medically negligent in prescribing an inadequate potassium supplement upon learning of Mrs. Richter's critical value potassium level of 2.3.

7.      Dr. Winterkorn was medically negligent in not cancelling the embolization procedure for the 2.3 potassium level.

8.      Dr. Winterkorn was medically negligent in failing to recheck Mrs. Richter's potassium level before proceeding with the embolization procedure.

The jury found in favor of Dr. Winterkorn on all theories. The jury clearly accepted Dr. Winterkorn's version of the presurgery events over Dr. Lovato's. We fail to see how Dr. Lovato's additional testimony in the form of an opinion about presurgery decisions would have made any impact on the final result of the jury's deliberations. After all, Dr. Lovato was not an uninterested witness. His personal fault and liability was at stake. As such, even if the district court had erred, it would be harmless. *See* Rule 1-061 NMRA.

## B.      Directed Verdict Was Not Improper

**{56}**    We review de novo the district court's decision on a motion for a directed verdict. *McNeill v. Burlington Res. Oil & Gas Co.*, 2008-NMSC-022, ¶ 36, 143 N.M. 740, 182 P.3d 121. We will uphold a district court's grant of directed verdict only if it is clear that "the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result." *Melnick v. State Farm Mut. Auto. Ins. Co.*, 1988-NMSC-012, ¶ 11, 106 N.M. 726, 749 P.2d 1105. We review a district court's evidentiary rulings for an abuse of discretion. *State v. Harrison*, 2000-NMSC-022, ¶ 18, 129 N.M. 328, 7 P.3d 478. In order to find an abuse of discretion, this Court must conclude that the district court's decision to admit or exclude testimony "was obviously erroneous, arbitrary, or unwarranted." *Id.*

## 1.      Plaintiff Failed to Present Expert Testimony on the Standard of Care

**{57}**    Plaintiff asserts that Dr. Winterkorn committed medical negligence when he continued with the embolization procedure after Mrs. Richter had developed arrhythmia. Plaintiff was required to present expert testimony regarding the standard of care applicable to Dr. Winterkorn and whether his conduct fell below that standard. *See* UJI 13-1102 NMRA; *Lopez v. Sw. Cmty. Health Servs.*, 1992-NMCA-040, ¶ 13, 114 N.M. 2, 833 P.2d 1183 ("In a medical malpractice case, because of the technical and specialized subject matter, expert medical testimony is usually required to establish departure from recognized standards in the community."); *Mascarenas v. Gonzales*, 1972-NMCA-062, ¶ 6, 83 N.M.

17

749, 497 P.2d 751 ("Should the condition be such that knowledge about it is peculiarly within the knowledge of medical men, then a court should not allow a jury to conjecture or speculate about the matter." (internal quotation marks and citation omitted)). To establish the standard of care for Dr. Winterkorn's conduct, Plaintiff offered testimony from Dr. Sibbit, an interventional radiology expert. However, Dr. Sibbit explained that there was no standard practice that an interventional radiologist would use regarding the embolization of a patient's arteries and stopping the procedure when a patient begins to develop arrhythmia. He testified that there is not enough data or information to identify the standard practice or methodology for addressing the complication in the embolization procedure that occurred in this case. As a result, Dr. Sibbitt could not indicate whether Dr. Winterkorn was negligent regarding the arrhythmia that developed during Mrs. Richter's embolization procedure.

**{58}** Plaintiff argues that testimony from Dr. Eigelberger, a general surgeon, also established the standard of care applicable to Dr. Winterkorn's procedure. However, the district court found, and Plaintiff does not challenge, that Plaintiff failed to lay the foundation for Dr. Eigelberger to opine as to whether Dr. Winterkorn's conduct was negligent. *See Giovannini v. Turrietta*, 1966-NMSC-103, ¶ 4, 76 N.M. 344, 414 P.2d 855 ("The [district] court's findings, not properly attacked, are conclusive on appeal."). Consequently, Dr. Eigelberger never provided an expert opinion regarding the proper standard of care or whether Dr. Winterkorn was negligent in addressing the complication that developed during Mrs. Richter's embolization procedure. Plaintiff's own expert, Dr. Sibbit, opined that a general surgeon such as Dr. Eigelberger would not be qualified to offer an opinion on the standard of care applicable to an interventional radiologist in circumstances like those in this case. As a result, Dr. Eigelberger's testimony does not assist Plaintiff in overcoming the motion for a partial directed verdict.

**{59}** As an alternative, Plaintiff argues at length about facts in the record that might support an inference that common sense and basic anatomy would require Dr. Winterkorn to stop the procedure immediately after Mrs. Richter developed an arrhythmia. However, these factual arguments do not constitute the kind of expert testimony required to set the standard of care for Dr. Winterkorn's conduct, because "arguments of counsel are not evidence." *Muse v. Muse*, 2009-NMCA-003, ¶ 51, 145 N.M. 451, 200 P.3d 104; *see* UJI 13-1102; *Cano v. Smith's Food King*, 1989-NMCA-080, ¶ 5 , 109 N.M. 50, 781 P.2d 322 (holding that medical causation ordinarily must be supported by expert medical testimony).

## 2.    A Physician's Promise Does Not Establish the Standard of Care

**{60}** Finally, Plaintiff asserts that Dr. Winterkorn was negligent because he had broken an earlier promise to stop the embolization procedure at the first signs of an arrhythmia. Plaintiff fails to provide any authority to support a theory of medical negligence based solely upon statements by the operating physician that he intended to stop the medical procedure if certain complications arose. *See State v. Godoy*, 2012-NMCA-084, ¶ 5, 284 P.3d 410 ("Where a party cites no authority to support an argument, we may assume no such authority exists."). As a result, this Court will not speculate or presume that Dr. Winterkorn's

statement was a proper basis to establish medical negligence. *See Cervantes v. Forbis*, 1964-NMSC-022, ¶ 15, 73 N.M. 445, 389 P.2d 210 (refusing to speculate in the absence of proof as to whether the defendant's doctor should have used an X-ray to place an intramedullary pin). We need not address the theory any further.

**{61}** Plaintiff presented no expert testimony that Dr. Winterkorn breached any standard of care by continuing the embolization procedure when Mrs. Richter developed an arrhythmia. As such, Plaintiff failed to present a viable medical negligence issue against Dr. Winterkorn for the jury's consideration. It was not error for the district court to grant a partial directed verdict in favor of Dr. Winterkorn and we affirm.

## IV. Comparative Negligence Principles Require the District Court to Consider the Comparative Negligence of Non-Parties.

**{62}** We now address Plaintiff's argument that the district court violated the three- year Medical Malpractice Act statute of limitations when it permitted the jury to compare the alleged negligence of Mrs. Richter's 2001 physicians, who were non-parties in this case, with the negligence of Drs. Winterkorn and Lovato. Plaintiff's argument asks this Court, in effect, to allow comparative negligence to apply exclusively against the parties actually brought to court, regardless of the fault of other non-parties. Plaintiff has failed to provide this Court with any authority supporting this novel policy argument regarding the application of comparative negligence in New Mexico. *See State v. Garcia*, 2005-NMCA-065, ¶ 7, 137 N.M. 583, 113 P.3d 406 (recognizing that an appellate court will not consider an issue if no authority is cited in support of the argument).

**{63}** In fact, the district court cannot ignore the comparative liability of non-party tortfeasors in negligence cases. *See Seeds v. Lucero*, 2005-NMCA-067, ¶ 23, 137 N.M. 589, 113 P.3d 859 (recognizing "the burdens imposed in comparative negligence cases where the parties must deal with evidence of the negligence of non-party tortfeasors"). Comparative negligence requires a determination of the percentage of negligence of each plaintiff, defendant, beneficiary, and non-party that caused the plaintiff's total damage. The sum of the percentages must equal 100. *See* UJI 13-2219 NMRA (requiring that the jury "[c]ompare the negligence, if any, of [plaintiff(s)] [beneficiary(ies)] [and] [defendant(s)] [and] [non-parties] and determine a percentage for each"). The Use Note for UJI 13-2219 states: "This instruction is to be used only in cases where there is an issue of apportionment of negligence among defendants or non-parties." *Id.* The Use Note for UJI 13-2218 NMRA is also authoritative where it states: "This instruction is to be used only in cases where there is no apportionment of negligence among defendants or non-parties."

**{64}** *Christus St. Vincent Regional Medical Center v. Duarte-Afara*, 2011-NMCA-112, 267 P.3d 70, does not change our analysis. In *Christus St. Vincent Regional Medical Center* we held that the hospital could not pursue an indemnification claim against doctors when the Medical Malpractice Act statute of limitations had expired for the underlying tort. *Id.* ¶ 32. Our decision was based in large part on the practical idea that the doctors should not be

19

made to face monetary obligations for acts which could no longer be the subject of actions against them. *Id.* ¶ 16. The situation here is different. The 2001 physicians who were named as non-party tortfeasors did not face the possibility of having to pay anything. Thus the rationale of *Christus St. Vincent Regional Medical Center* does not fit.

## V.    Proceedings on Remand

**{65}**    Given our decision to reverse in part we must consider how the matter should proceed on remand. New Mexico case law provides a ready answer to only one of the myriad of possibilities. In *Buffett v. Vargas*, 1996-NMSC-012, ¶ 29, 121 N.M. 507, 914 P.2d 1004, our Supreme Court noted that "a party exonerated at [a prior] trial should not automatically be subjected to a new trial whenever there has been an error at trial with regard to the liability of someone else." The Court then adopted a test from an Idaho case which focused on "whether there is a clear showing that the issues in the case are so distinct and separable that a party may be excluded without prejudice." *Watson v. Navistar Int'l Transp. Corp*, 121 Idaho 643, 669, 827 P.2d 656, 682 (Idaho 1992).

**{66}**    As to the physicians involved in the 2005 treatment and surgery for Mrs. Richter, the jury determined both the liability and amount of damages to be awarded against Dr. Lovato as well as rendering a determination that Dr. Winterkorn was not negligent. We have found no specific error in the jury verdict or other rulings that Plaintiff has argued regarding the 2005 treatment and surgery by Dr. Lovato and Dr. Winterkorn. Dr. Winterkorn thus stands exonerated through the first trial. Applying *Watson* and *Buffett*, we see no basis to require that he be part of the trials to come. The asserted negligence of TriCore and PHS occurred four years before Dr. Winterkorn had any contact with Mrs. Richter and there is no suggestion that he could or should have known of her 2001 test results. As such, Dr. Winterkorn's conduct is separate and distinct enough from TriCore's and PHS's that the trial court's error as to them cannot be deemed to effect or infect the jury's finding as to him. Dr. Winterkorn may be excluded from the succeeding trial without prejudice to other parties.

**{67}**    Much of the same analysis can be applied to Dr. Lovato. That is, there is no indication that he could or should be charged with knowledge of Mrs. Richter's 2001 test results or TriCore's and PHS's 2001 conduct. However, the fact remains that Dr. Lovato was found to be negligent by the jury. This alone makes it problematic to apply the *Watson*/*Buffett* test given that it is usually used in connection with parties who have been found not negligent. *Buffett*, 1996-NMSC-012, ¶¶ 27, 29, 31. In addition, as we have noted above, basic principles of comparative negligence dictate that all persons contributing to an injury be included in the apportionment of fault. As such, the comparative fault of Dr. Lovato must still be part of the trial on remand.

**{68}**    The scope of the trial on remand remains to be determined. Having never been tried, TriCore's and PHS's liability—if any—must be determined in accordance with this Opinion. And, of course, the comparative fault of all parties other than Dr. Winterkorn must be tried and determined. The most vexing issue—and the issue of most interest to the parties—is the

question of damages. TriCore and PHS argue that the damages verdict in the first trial should be deemed res judicata as to the issue. Plaintiff argues that a trial involving two entirely new parties requires that damages should not be treated as res judicata. Dr. Lovato argues essentially that whatever the outcome of a new trial, he should not be forced to face new or increased liability.

**{69}** We have found limited New Mexico case law that addressed the damage issue, and this authority neither addresses nor provides guidance in resolving a medical negligence case such as this one. *See Flores v. Baca*, 1994-NMSC-021, ¶ 25, 117 N.M. 306, 871 P.2d 962 (recognizing the application of res judicata to plaintiff's compensatory damage award when the issue of punitive damages will be tried for the first time upon remand due to an error in awarding a directed verdict on punitive damages at the first trial); *Sanchez v. J. Barron Rice, Inc.*, 1967-NMSC-077, ¶¶ 37-38, 77 N.M. 717, 427 P.2d 240 (limiting retrial to one claim of negligence against one defendant and affirming the jury verdict in favor of the remaining defendants as severable claims that need not be retried); *Cherry v. Stockton*, 1965-NMSC-114, ¶¶ 7-8, 75 N.M. 488, 406 P.2d 358 (limiting retrial to the issue of liability of the second defendant under the theory of a master and servant relationship after the jury verdict regarding damages was not appealed). Each of the parties' positions have something to commend them and none is obviously "right." We conclude that the Colorado Supreme Court's decision in *HealthONE v. Rodriguez ex rel. Rodriguez*, 50 P.3d 879, 890-91 (Colo. 2002) (en banc) provides the most workable and reasonable approach to problems of remand in cases such as this, and we adopt it.

**{70}** The Plaintiff in *HealthONE* sued his treating physician, the hospital where he received his treatment, and another, non-treating doctor who plaintiff asserted created the circumstances that led to his injuries. The trial court granted summary judgment in favor of the non-treating doctor and the matter proceeded to trial against the treating physician and the hospital. On appeal the summary judgment was reversed. Accommodating the interests of all the parties, the Colorado Court ordered that on remand: (1) the treating physician and the hospital would be treated as having settled the case before retrial—thus preserving their liability intact, and (2) the non-treating doctor would go to trial but the prior damages verdict would not be imposed on him—thus preserving his desire for a new trial on all issues applicable to him. This approach preserved the parties' position after the first trial but allowed a full trial where none had been had before.

**{71}** The Colorado Court's approach presents a neutral basis upon which to premise trial on remand in cases such as this because it preserves what occurred at the first trial but allows a full new trial as to issues not tried before.

**{72}** Applying the procedure here, the verdict form should include all of the nonparty physicians as before, plus Dr. Lovato, TriCore and PHS. The jury will determine comparative negligence as well as damages anew. Regardless of the outcome at trial, Dr. Lovato's liability for any damages shall remain the same as was determined by the first jury and he shall be treated as if Plaintiff's claim against him was settled prior to retrial.

21

TriCore's and PHS's liability—if any—will be decided by the jury without regard to the damages found previously.

**CONCLUSION**

**{73}** For the foregoing reasons, we affirm in part and reverse in part the judgment of the district court. We remand for further proceedings against TriCore and PHS consistent with this Opinion.

**{74} IT IS SO ORDERED.**

 

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

 

_____
**TIMOTHY L. GARCIA, Judge**

 

_____
**CELIA FOY CASTILLO, (Judge Pro Tem)**

**Topic Index for *Richter v. Presbyterian Healthcare Servs.*, Nos. 30,926/31,004**

**APPEAL AND ERROR**
Remand
Standard of Review

**CIVIL PROCEDURE**
Directed Verdict
Expert Witnesses
Summary Judgment

**EVIDENCE**
Expert Witness

**JUDGES**
Abuse of Discretion

**NEGLIGENCE**
Comparative Negligence
Negligence, General
Standard of Care

Wrongful Death

**TORTS**
Medical Malpractice
Wrongful Death